IN ERROR.
........

ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

JAMES ANDERSON, plaintiff in error,

*against*

JAMES JACKSON, *ex dem.* MEDCEF EDEN, defendant in error.

*E. devised a farm to his son Joseph, his heirs, &c. for ever; and another farm to his son Medcef, his heirs, &c for ever; and added, " it is my will that if either of my said sons should depart this life without lawful issue, his share or part shall go to the survivor;" and in case of both their deaths without lawful issue, he gave the property to his brother and sister in England. Joseph died without lawful issue: Held, that the words did not create an estate tail, especially since the statute abolishing entails; but was a good limitation over in fee, by way of executory devise, to the survivor, on failure of issue living at the death of either of the sons.*

THIS was an action of ejectment for land in *West Chester.* The defendant in the Court below pleaded the general issue; and the cause was tried at the *West Chester* circuit, in *June*, 1817, before Mr. Justice *Van Ness*, when a *special* verdict was found, containing the following facts : *Medcef Eden,* the elder, being seised, in fee, of the premises in question, and having issue, two sons, named *Joseph* and *Medcef*, on the 29th of *August*, 1798, made his will, and, among other things, devised as follows : " I give my son *Joseph* (describing various parcels of real estate in the city of *New-York*,) also, one other farm, with the appurtenances and improvements, in the late manor of *Fordham,* town of *West Chester,* (the premises in question,) &c. &c. to have and to hold, receive, take, and enjoy, all and singular the herein before mentioned, and intended to be hereby bequeathed, premises, unto the sole and only proper use and behoof of my said son *Joseph*, his heirs, executors, administrators, an d assigns, for ever, from the time of my decease, as, and for his own proper goods, and chattels, lands and tenements, for ever, and that in as full, large, ample, and beneficial manner, to all intents and purposes, whatsoever, as I, the said *M. E.*, (if living,) could, or ought to take and enjoy, hold and receive, all and singular, the herein before mentioned and intended to be hereby bequeathed, and above described premises. And I give, devise, and bequeath to my son *Medcef,* all and singular, my farm and tract of land at *Bloomingdale,* &c. (decribing it and other real property,) to have and to hold, receive, take and enjoy, all and singular the herein before mentioned, and intended to be hereby given, devised, and bequeathed premises, and every part and parcel thereof, unto the sole and only proper use, benefit, and behoof of my said son, *Medcef*, his heirs and assigns, from the time of my decease, as for his own proper estate, for ꞈver ; and that in

as full, large, ample, and beneficial a manner, to all intents and purposes whatsoever, as I, the said *M. E.* (if living,) could or might have, hold, and enjoy, all and singular, the herein before mentioned and intended to be hereby given, devised and bequeathed and above described premises." The testator, after making provision for his wife, and some further bequests and directions, adds the following clause: "*Item;* it is my will, and I do so order and appoint, that *if either of my said sons should depart this life without lawful issue, his share or part shall go to the survivor,* and in case of both their deaths without lawful issue, then I give all the property, aforesaid, to my brother, *John Eden* of *Loftus,* in *Cleveland,* in *Yorkshire,* and my sister *Hannah Johnson,* of *Whitby,* in *Yorkshire,* and their heirs."

The testator died seised, *September* 8, 1798, and *Joseph Eden* took possession, of the premises so devised, under the will. On the 4th of *August,* 1802, the premises in question were sold on an execution against *Joseph Eden,* and a deed was executed for the same by the sheriff of *West Chester* to *Joseph Winter,* who took possession under that deed. On the 8th of *February,* 1804, *J. W.* conveyed the premises to *James Anderson,* the plaintiff in error, who entered and became possessed thereof. *Joseph Eden* died on the 20th of *August,* 1813, without lawful issue; and his brother, *Medcef,* on the 1st of *January,* 1814, entered on the premises, from which he was *ousted* by *J. A.;* and *M. E.,* the lessor of the plaintiff below, thereupon brought his action of ejectment to recover the possession.

The cause on the special verdict was decided by the Supreme Court, in *January* term, 1818, without argument; and the Court, considering the questions raised to have been already settled by the decision of former cases, did not enter into an examination of the points at large; but merely said, that after the decision of this Court, in the cases of *Fosdick* v. *Cornell,* (1 *Johns. Rep.* 440.) *Jackson* v. *Blanshan,* (3 *Johns. Rep.* 189.) executors of *Moffatt* v. *Story,* (10 *Johns. Rep.* 12.) and *Jackson* v. *Staats,* (11 *Johns. Rep.* 337.) and the careful and elaborate examination taken of all the authorities on this subject, the question, (whether *M. E.,* the lessor of the plaintiff, took the premises. as executory devisee,) ought

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
.v.
JACKSON.

to be considered at rest. That there was no possible dis-tinction, on which this case could be taken out of the prin-ciple which governed the decisions in those cases ; and that the plaintiff must, accordingly, have judgment.

To reverse this judgment, the writ of error was brought to this Court.

*D. B. Ogden*, for the plaintiff in error. 1. If the statute of this state, *for abolishing entails*, had not been passed, *Joseph Eden* would have been seised *in fee tail* of the pre-mises in question under the devise.

By the common law, a grant to *A. B.* and to the *heirs of his body*, was called a *conditional fee*, as contra-distinguish-ed from a fee simple ; and it was construed a fee simple, on condition that the donee had heirs of his body. It was de-cided, that if the donee of an estate of this kind had issue born, his estate became absolute, by the performance of the condition, so far, at least, as to enable him to aliene, to sub-ject it to forfeiture for treason, and to enable him to charge or incumber it. (1 *Cruise's Dig.* tit. 2. ch. 2. sec. 1, 2, 3 4, 5.) To guard against the construction put by the judges on such grants, the statute *de donis conditionalibus*, (13 *Edw.* I. ch. 1. A. D. 1285.) called the statute of *West-minster*, 2. was passed, and which is the parent of *estates tail ;* an estate tail being defined to be an estate of inheri-tance created by the statute *de donis*, descendable to some particular heirs only of the grantee, and not to his heirs general. (*Cruise*, tit. 2. ch. 1. sec. 12. *Litt.* sec. 13.) The first cases which arose under the statute are to be found in the *Year Books*. (*Book of Ass.* 35 *Edw.* III. pl. 14. 37 *Edw.* III. pl. 15. *Y. B.* 5 *Hen.* V. 6 pl. 13.) So stood the law, when the statute of *Wills*, (32 *Hen.* VIII. ch. 1.) was passed, in 1540, which empowered persons having an estate in lands, &c. to dispose of it, by a last will and testament.

Now, an estate tail, under the statute *de donis*, instead of being a conditional fee, as it had originally been adjudged to be by the common law, became a particular estate in the donee, leaving the reversion in the donor. (1 *Burr.* 115. 2 *Inst.* 335.) The statute of *Wills*, therefore, could

only operate upon that part of the estate which remained in, or reverted to, the donor and his heirs, after the deter-termination of the particular estate. If the words of the grant created an estate tail in the grantee, by virtue of the statute *de donis*, the nature of that estate could never be changed, by any disposition which the donor might make of the reversion, by virtue of his last will, under the statute of wills. The construction of wills, in regard to these words, are the same as before given to them in deeds; and under that construction, the doctrine of executory devises could not arise.

To show what words in a will had been uniformly held to create an estate tail, and that the words *dying without issue,* mean an indefinite failure of issue, the counsel cited *Clache's Case, Dyer* 330. *b. Sonday's Case,* 9 *Co.* 128. *Brown* v. *Jervas, Cro. James,* 290. *Webb* v. *Hearing, Cro. James,* 415. *King* v. *Rumball, Cro. James,* 448. *Chadock* v. *Cowley, Cro. James,* 695. *Fortescue* v. *Abbot, Pollexfen,* 479. *Holmes* v. *Meynell, T. Raym.* 452. *Lyte* v. *Willis, Forrest.* 1. *Parker* v. *Thacker,* 3 *Lev.* 70, 71. *Nothingham* v. *Jennings,* 1 *Salk.* 233. *Preston, ex dem. Eagle,* v. *Funnel, Willes' Rep.* 164, 165, 166. note. *Brice* v. *Smith, Willes,* 1. *Goodright* v. *Good-ridge, Willes,* 369. *Hope, ex dem. Brown,* v. *Taylor,* 1 *Burr.* 269. *Wyld* v. *Lewis,* 1 *Atk.* 432. *Beauclerk* v. *Dormer,* 2 *Atk.* 308. *King* v. *Melling,* 1 *Vent.* 214, 215. *Langley* v. *Baldwin,* cited in *Andrews,* 339. and 2 *Str.* 801. *Allanson* v. *Clitherow,* 1 *Ves.* 24, 25. *Morgan* v. *Griffith, Cowp.* 234. *Denn.* v. *Slater,* 5 *Term Rep.* 335. *Doe* v. *Rivers,* 7 *Term Rep.* 276. *Doe* v. *Halley,* 8 *Term Rep.* 5. *Lewis* v. *Wa-ters,* 6 *East Rep.* 336. *Doe* v. *Ellis,* 9 *East,* 382. *Powell on Executory Devises,* 203. 2 *Fearne's Post. Works,* 176. *Tenny* v. *Agar,* 12 *East,* 253. *Dansey* v. *Griffiths,* 4 *Maule & Selw.* 61. *Romilly* v. *James,* 6 *Taunt.* 263. *Henry* v. *Hancock,* 4 *Dow's Parl. Rep.* 145. *Roosevelt* v. *Thurman,* 1. *Johns. Ch. Rep.* 227. *Wilmot's Opinions,* 309. *Barlow* v. *Salter,* 17 *Vesey,* 479. 481.)

The statute *de donis* was passed to prevent the alienation by the tenant, in case the estate became absolute, by his hav-ing heirs. But where the gift was to *A.*, and the heirs of his body *at his death,* or to *A.*, and his issue, *living at his death,*

as the condition could not be fulfilled until his death, he could not convey, and the case was not within the statute *de donis*, but remained a *conditional fee at common law.* Whenever the devise is to *A.* and the *heirs of his body*, or to him and *his issue*, where no definite period is fixed, or without reference to the death of the donee, this is understood to mean an indefinite failure of issue; and is an estate tail under the statute *de donis.*

The Supreme Court, in *Fosdick* v. *Cornell*, (1 *Johns. Rep.* 440.) which will, probably, be cited against the construction for which we contend, relied much on the case of *Pell* v. *Brown.* That was a devise " to *Thomas*, his son, and his heirs for ever, *paying* to his brother *Richard*, 20 pounds, at the age of 21 years; and if *Thomas* died without issue, leaving *William* his brother, that then *William*, his brother, should have those lands to him and his heirs and assigns for ever." This case was not within the statute *de donis;* for the tenant could not aliene; it remained a conditional fee at common law. So, also, are the cases in *Dyer*, 124. 354. As regarded *personal* property, there appears to be some confusion in the cases to be found in the books; but there is not a case to be met with, in which the doctrine has been questioned as to *real* property. If a devise be to *A.*, and if he die *without issue*, then to *B.*, the Supreme Court admit that it is an *estate tail;* but if the devise be to *A.*, and if *B. survive* him, then to *B.* it would be different. But there is no real difference in the two cases. In *Barlow* v. *Salter*, (17 *Vesey*, 479.) it was held, that the words " die without issue," mean a general failure of issue. The case of *Jackson* v. *Staats*, (11 *Johns Rep.* 337.) was put, as to this question, entirely on that of *Fosdick* v. *Cornell.* *Van-ness*, J. gave no opinion on this question, and *Platt*, J. gave no opinion in the cause.

If the devise, in this case, means without issue *living at the death of the devisee*, then it was a conditional fee at common law, and the devise over is good, by way of *executory devise;* but if the words mean an *indefinite failure of issue*, then the devise over is not good, the contingency being too remote; and *Joseph E.* took an *estate tail*, which, by the statute, is converted into a fee simple absolute.

*T. A. Emmet* and *Burr*, contra,   The rule of construction which, it is contended, has prevailed in *England*, gives to the same words a different meaning when applied to a devise of personal estate, and when to that of real estate ; as in the case of *Forth* v. *Chapman*, where both real and personal estate were devised in the same sentence.   This rule applied to real estate, it has long since been confessed, defeats what every person feels and acknowledges to be the real intention of the testator ; and it prevails in *England* only, because it is too inveterate to be corrected, without great inconvenience.   The rule has been universally spoken of with disapprobation.   Chief Justice *Wilmot*, (*Opinions*, 308, 309. 314. *Keiley* v. *Fowler*.) says, that such an exposition of the words " produces this monstrous absurdity : it makes dying *with issue* and dying *without issue*, to mean directly the same thing."   " It is a shameful abuse of language to say, that dying without issue, on this day, the 1st of *February*, 1768, and being dead without issue, upon the 1st of *February*, 1900, mean one and the same thing.   It is repealing that great law of all language, the grammar, and confounding present and future time together.   It is the most intolerable tyranny, the grossest barbarism, to say, they mark one idea, when the man who uses them, and all who read and hear them, are convinced they mark another." " I cannot," he adds, " help shedding a tear upon the introduction of such a solecism into the land.   But I will relate how it happened : it was owing to a fundamental mistake originally, in transferring a construction which had been put upon these words, when applied to estates of inheritance, which might be entailed, to leasehold, and personal estates which could not be entailed."   Speaking of several of the cases, he says, that while the judges " admitted the rule, they have shut their eyes upon the vulgar sense of the words *die without issue*, and swallowed the legal sense bitter as it is : this was done to avoid confusion, and the disturbing personal property enjoyed under the sanction of it ; but, at the same time, they have catched at any word or expression, which might bring the case out of the rule." Though the opinion of Chief Justice *Wilmot* was expressed in regard to personal property, it is equally applicable to a

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

devise of real property. Wherever there has been any slight difference of phraseology, which would justify a departure from the rule, the judges have seised upon the opportunity of deviating from it, in order to arrive at the real intention of the testator. Thus in *Pells* v. *Brown,* the words, " living *William* ;" in *Porter* v. *Bradley,* " leaving no issue behind him ;" in *Roe* v. *Jeffrey,* " should depart this life, and leave no issue," have been deemed sufficient to take the case out of the rule.

Amidst these discordant constructions and nice and subtle distinctions, to be found in the *English* books, our Court has settled the law, so as far as it is possible, to effectuate the intention of the testator. And now, after these decisions have acquired a legal stability, and have formed the foundation of many legal titles, it is sought to overturn them, and throw us back to a construction which, in this state, must defeat every intention of the testator, either to protect the issue of his devisee, or, in case there was no issue, to give the estate to his brother.

To do this, the counsel for the plaintiff in error have resorted to the ancient doctrine of a *conditional fee ;* but if it were true that this would have been a conditional fee, and within the statute *de donis,* yet, that statute being repealed, it remains a conditional fee, and the condition not being performed, the fee is out of *Joseph E.* But this would have been a void condition at common law, as the benefit of it is reserved, not to the donor and his heirs, but to a third person. (*Co. Litt.* 214. *a.*) It was repugnant to the nature of the estate to which it was annexed, by restraining the alienation of a fee simple previously given by the fullest words of conveyance. (*Co. Litt.* 206. *b.* *Hob.* 170.) It would be void, moreover, as contrary to the policy of the law, by limiting a fee upon a fee. Such a condition or limitation could never have been made valid, except by the indulgence given to the construction of uses and devises ; in a common law conveyance, operating by livery of seisin, it would be utterly void. The principle that the intention of the grantor to uses, or of the devisor, was to be effectuated, if it could be done, gave rise to estates tail by implication, and to executory devises or uses ; and under

one or other of these, those conditions or limitations were made effectual, which would have been void in a common law conveyance. But that mode of effectuating them was introduced long after conditional fees were lost sight of, and might be considered as extinct, or to be regarded only as among the antiquities of the law. They are not, therefore, spoken of, or considered as conditional fees, but either as estates tail or executory devises. The distinction attempted to be made by the counsel for the plaintiff in error is not to be found; for long before these limitations were upheld, conditional fees had ceased to be regarded. Those limitations by will, which were considered as estates tail by implication, rather than executory devises, were so held, either because it was supposed that such a construction would best effectuate the intention of the testator to protect the issue of the devisee from an alienation by their father; or because executory devises being unknown to the common law, and, perhaps, contrary to its genius, and only resorted to, *ut res magis valeat quam pereat*, it was a principle to construe nothing as an executory devise which could be construed a contingent remainder, where a sufficient estate to support a remainder could be intended to have been created. Executory devises ought, no doubt, to have been favourites of the Courts, as they most truly effectuate the intention of the testator.

IN ERROR.
......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

But the foundation of the *English* rules of construction have been entirely taken away, by the changes which have been introduced into the law of this state; and which, in regard to recent wills, at least, compel us to adopt different rules of construction. *Tempora mutantur, et nos mutamur cum illis*, is an observation founded in good sense. In *Richardson* v. *Noyes*, (2 *Mass. Rep.* 62.) *Sedgwick*, J. observes, " that in construing language, the custom, manners, habits, or laws, relative to the subject matter of it, are to be taken into consideration."

Since the act of 1786, abolishing entails, there can be no estate tail; and by the act, repealing the *English* statutes from 1788, the statute *de donis* was repealed. There is, then, no law that could give birth to an estate tail; or if there could be such an estate created, it is, by the opera-

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

tion of the statute, annihilated at the very moment of its birth. In *Roosevelt* v. *Thruman*, (1 *Johns. Ch. Rep.* 220.) the will was made in 1769. It is unnecessary to discuss the question, as to what estate would be made by using the express words which would formerly have created an estate tail, whether a conditional fee, or fee simple absolute; because, since the year 1788, under the law of this state, no estate tail could be created *by implication;* for no estate can be created by implication which cannot by law exist. When, therefore, the statute destroyed estates tail, and made them unlawful, it destroyed that estate which would support the remainder. The alteration of the law, by the statute, has, then, taken away the only two reasons which were ever assigned for construing such devises as estates tail by implication, instead of executory devises. It has, indeed, cut up estates tail by implication themselves, and left no way to legalize the devise at all, but by considering it an executory devise. If it should be attempted to preserve the ancient rule of construction, and blend it with the existing law, the consequence would be that every part of the testator's secondary intention would be defeated; not only that intention to protect the son against his father's acts, which the statute does not permit, but also to benefit the ulterior devisee, in the event of the first devisee dying without issue; for the devise to him is utterly defeated. Can, then, the *English* rules of construction, founded on reasons which our law has destroyed, be suffered to continue? Must we not rather, in every case, have recourse to *executory devises*, to support these limitations? The will, in this case, was made ten years after the repeal of the statute *de donis*, and twelve years after estates tail were abolished; yet we are now called upon to suppose that the testator intended to create an estate tail, when every presumption must be, that he knew that such an attempt would be ineffectual, and that he did not wish to violate the law. Every layman might well know that law, though he might not understand the legal operation of words to create an estate tail, by implication.

The construction which we contend for has long been established as to devises of personal property; and the

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

counsel on the other side say, that the decisions of the Supreme Court are founded on a mistaken application of cases decided where the question was as to personal property. Lord *Kenyon*, in *Porter* v. *Bradley*, said, " it would be very strange, if these words had a different meaning, when applied to real and personal property. If such a distinction existed in the law, it certainly would not agree with the rule, *lex plus landatur quando ratione probatur :* but it is not founded in law." The reasons for the difference of the construction were, that there could be no estate tail of personal property; neither by express words, for then it was a fee, nor by implication, for then it was an executory devise. These reasons admit, that wherever property cannot, by law, be entailed, and whenever the devise over would otherwise fail, it must be construed as an executory devise. Now, our law has, in both these respects, put real and personal property on the same footing ; and the rule as to personal property ought, therefore, to be applied to real property, as being the only one applicable to the present law of the state as to the tenure of real estate. But if we were to choose between the two rules of construction, we ought to take that which has been adopted by the Supreme Court; for the *English* judges, in every case where they could catch at an expression to take the case out of the rule of their courts, have done it.

The question here is, whether it was the intention of the testator to give the estate to his son *Medcef*, if *Joseph* should have no issue at the time of his death ; or, whether he meant that *Medcef* should never take any estate in the property; and that *Joseph* should have the entire dominion over it, so as to prevent his own children, or those of *Medcef*, from taking it. Did he contemplate an indefinite failure of issue, or a failure of issue at the time of the death of his son ? Did he look forward to provide for a failure of issue in the *tenth* or *twentieth* generation ? Did he not rather mean, as every plain man, drawing his own will and using those words, would have intended, in case either of his sons should " depart this life without lawful issue, *at the time of his death ;* not without issue three hundred years afterwards. The limitation to the *survivor* shows, also, that he contem-

plated the event to take place in the life time of such *survivor*. (*Atkinson* v. *Hutchinson*, 3 *P. Wms.* 258. *Pells* v. *Brown*, *Cro. Jac.* 590. *Ide* v. *Ide*, 5 *Mass. Rep.* 500. 502. *Sheffield* v. *Orrery*, 3 *Atk.* 282.)

*Harison*, in reply. Under the colonial government, before the revolution, the laws of *England*, as they stood in the reign of *Charles* II. except such as were not applicable to our situation, were considered as the laws of this country.

By the 35th section of the constitution of this state, all those parts of the common and statute law, which together formed the law of the colony, on the 19th of *April* 1775, were to be and continue the law of the state, subject to such alterations and provisions as the legislature, from time to time, should make concerning the same.

The statute of *England* relative to entails were, confessedly, a part of the law of the colony. The same words in conveyances and wills which passed estates tail in *England*, created them in the colony, and they were converted into fee simple estates, by the same legal ceremonies.

Estates tail existed, by the laws of the state, from the adoption of the constitution, in 1777, until they were abolished by the act of the 12th of July, 1782, (sess. 6. ch. 2.) which was repealed by the act of the 23d of *February*, 1786, (sess. 9. ch. 12.) which, however, enacted their abolition; and declared further, that in all cases where any person or persons would, if the said repealed act, and the act of 1786, had not been passed, become seised in fee tail, of any lands, tenements, or hereditaments, by virtue of any devise, gift, grant, or other conveyance, such person or persons, instead of becoming seised thereof in fee tail, should be deemed and adjudged to become seised thereof in fee simple absolute. (1 *Greenl.* ed. *Laws N. Y.* 205.) The question, then, is, whether *Joseph Eden* would, if those acts had not been passed, have become seised in fee tail of the premises in question, by virtue of the devise from his father, or whether, independent of those statutes, the devise would give him an estate in fee simple, subject to executory devises? We contend that he would have been seised in fee tail;

IN ERROR.

ALBANY,
January, 1812

ANDERSON
v.
JACKSON.

and, consequently, that he became seised, by virtue of the act, in fee simple absolute.

1. As to the construction of the words of the devise to J. E. and his heirs, and if he died without lawful issue, then to his brother. The statute of *Westminster*, 2. (13 *Edw* I. ch. 1.) recites certain forms of gifts, many times made upon condition : 1. Where a man giveth his land to any man and his wife, and the heirs of their bodies begotten, and if *they die without heirs* of their bodies, between them begotten, the lands so given to revert : 2. Gifts in *frank marriage, &c.* in all which cases, by the common law, after issue begotten, they could disinherit the issue, which defeated the will of the donor. The statute, then, enacts that the will of the donor shall be observed, viz. that the land shall revert to the donor; 1. If there never was any issue ; 2. If such issue fail; 3. If the heirs of the body of such issue fail. Here it is obvious, that *dying without heirs of their bodies,* is considered as extending to the indefinite failure of issue ; for otherwise the *third* case of the statute, viz. the failure of the heirs of the body of the issue, could never have been considered as coming within the will or intention of the donor.

This was a parliamentary exposition of the words " dying without issue." If they were confined in their meaning to dying without issue at the time of the death of the first taker, there could be no reverter upon the failure of issue. The words, therefore, relate to an indefinite failure of issue.

The judicial exposition of these words, also, has uniformly been according to the statute *de donis.* So are the cases decided before the statute of wills. (*Book of Assizes*, 35 *Edw.* III. pl. 14. A. D. 1360. *Book of Assizes*, 37 *Edw.* III. pl. 15. A. D. 1363. 5 *Hen.* V. fol. 6. pl. 13.) Since the statute of 32 *Hen.* VIII. ch. 1. A. D. 1540, we may look to decisions upon *wills.* The rule for expounding *gifts* was the *will* of the *donor ;* the rule for the construction of *wills,* is the *will* of the *testator.* In both cases, the *will* or *intention* was to be discovered from the deed or the will, not from extraneous evidence. The legal meaning of the words, *dying without issue,* having been settled in the construction

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

of deeds, it would have been absurd to have expounded them differently when used in wills ; the rule, that is, the *will* of the donor or testator, being the same. The observation of Chief Justice *Wilmot*, (*Wilmot's Opinions*, 308.) therefore, where he laments, that some of the greatest and ablest men have followed one another in saying, that these words, alone and by themselves, must be construed to mean, " being dead without issue at any future time," is surprising. Could they have decided otherwise ? Chief Justice *Wilmot* himself, (p. 310.) admits that they could not, because it was to comply with the *intention* of the testator, that this construction, as to estates of inheritance, was adopted. That such, in fact, has been the construction upon wills, as far back as we can trace the subject, will appear from an examination of the cases, and it has uniformly continued in *England*. The counsel here entered into a particular examination of the cases. (*Clache's Case*, 330. *b*. *Sonday's Case*, 9 *Co.* 128. *Brown* v. *Jervas*, Cro. Jac. 290. *Webb* v. *Hearing*, Cro. Jac. 415.) In *Pells* v. *Brown*, (Cro. Jac. 590.) the judges did not mean to alter the law where the clause, if he died without issue, was absolute and indefinite ; but they say, *that* was not such a case, but a conditional limitation, not to take effect unless the dying without issue should be in the *life time of the brother* (*William*.) In *Chadock* v. *Cowley*, (Cro. Jac. 695.) the devise was to the wife for life ; after her decease, certain of the lands to the testator's son *Thomas*, and his heirs for ever, and certain other of the lands to his son *Francis*, and his heirs for ever; and the testator added, " *Item.* I will *that the survivor of them* shall be heir to the other, if either of them die without issue ; and it was held to be a devise in tail. In this case the distinction made in *Pells* v. *Brown* was recognised ; but the general words were held to relate to an *indefinite failure* of issue. This case has never, in *England*, been denied to be law ; on the contrary, it is recognised and confirmed in *Fortescue* v. *Abbott*, (*Pollexfen's Rep.* 487.) and the same doctrine has prevailed since that time. In *Beck's Case*, (*Sir Edw. Litt. Rep.* 253. 285. 345.) which arose upon a deed, *Richardson*, Ch. J. who gave the judgment of the Court, says, it is given to the use of the first son who shall

have issue, and his heirs; this is in appearance a fee sim-
ple, but when the donor proceeds, and says, and for default
of issue, the remainder over, this should, upon all the words,
be a fee tail; as if land is given to one and his heirs, and it
is added, " and if he die without heirs of his body," this is
an estate tail, upon the whole, and declares what heirs he
intended, in the first words, to wit, heirs of his body.
(*Holmes v. Meynell, T. Raym.* 452. *Parker v. Thacher,*
3 *Lev.* 70, 71. *Tyte v. Willis, Forrest,* 1. *Nottingham*
v. *Jennings,* 1 *Salk,* 233.)

The counsel proceeded in the examination of the cases
cited by the opening counsel, and which, he contended, show-
ed most conclusively that the construction had been uni-
form, through a succession of great judges and eminent
lawyers. Even Lord *Kenyon,* who had gone farther than
any other judge, in giving effect to *executory devises,* in *Doe*
v. *Halley,* held, that the words, " in default of issue male
of *A.* then to *B.* &c." meant that *B.* should not take until
all the male issue of *A.* was extinct. In the late case of Sir
*Samuel Romilly* v. *James,* (6 *Taunt.* 263.) there was a devise
of all the real estate of the testator to his brother, subject
to the several devises therein after expressed ; then a de-
vise to *H. S.,* the testator's brother's son, of all his estate in
*R.,* to hold to him and his heirs for ever, and at the conclu-
sion of the will, the testator added, " in case my brother,
and his son, my nephew, should happen to die, having no
issue of either of their bodies, then I devise all my real es-
tate to my nephew, *J. C.* and his heirs, this was held to be an
estate tail in *H. S.,* with remainder in tail to the testator's
brother; not a defeasible fee simple, with an executory de-
vise over.

The judgment of the Supreme Court, in the present case,
was given without any argument, and on the authority of
*Fosdick* v. *Cornell,* which, it is supposed, laid down the doc-
trine, that the words " dying without issue" meant having
no issue at the time of the death of the devisee; and which
was followed by a *dictum* of *Spencer,* J. in *Jackson* v. *Staats,*
recognizing the case of *Fosdick* v. *Cornell.* If the Supreme
Court intended to lay down the doctrine, in its broadest ex-
tent, and these opinions go the length supposed, they are

IN ERROR. certainly in direct opposition to all the *English* adjudica-
.......
ALBANY,
January, 1819.
tions, from the time of passing the statute *de donis,* to the
present day. It is a natural and laudable desire in most
men, to keep their estate in their own families as long as
ANDERSON
v.
JACKSON.
they can; though, if the question had been *res integra,* it
would, perhaps, be of little importance what rule was to
prevail. But after the rule of construction has been esta-
blished for centuries, and become the law of property, the
Supreme Court have no power to alter it. If the rule was
found inconvenient, or not adapted to this state, the legis-
lature alone had the power to abolish it. Judges cannot
alter the law to suit their notions of inconvenience or poli-
cy. Such a power would be dangerous in the extreme. It
would overturn the pillars of our constitution, and subvert
all law and liberty.

If lands are devised without words of perpetuity, the
devisee takes only a life estate; yet such a rule, in almost
every case, defeats the intention of the testator. It is bet-
ter, however, to adhere to the general rule of law, than to
depart from it, from any supposed hardship in the particular
case.

2. Are there any particular expressions or context in this
will that will vary the construction for which we contend?
It is admitted, that there may be clauses or circumstances
stated in a will, which will justify construing what would
otherwise have been an estate tail, as a fee, subject to an
executory devise. These circumstances, however, must be
such, that it may fairly be collected from them that the tes-
tator used the words in a more confined sense. The legal
meaning of words ought not, as observed by Sir *William
Grant,* (*Barlow* v. *Salter,* 17 *Vesey,* 479.) to be narrowed
by expressions or circumstances that do not raise any fair
inference of restrictive intention; or, as Lord *Thurlow* said,
such construction is to be varied only by circumstances
arising on fair demonstration.(*a.*)    But the will in the pre-

(*a*) In *Doe, ex dem. Smith,* v. *Webber,* (1 *Barn. and Ald. Rep.* 713.)
there was a devise to *M. H.* of real and personal estate, to *M. H.* her
heirs, &c. for ever, and in case *M. H.* should happen to die *and leave no
child or children, then to J. B. and her heirs for ever, paying the sum*

IN ERROR,

.......

ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

sent case contains none of those expressions or circum-
stances which have been deemed sufficient to take the case
out of the rule. There are no words fixing a period to
which the failure of issue is limited; no words added to re-
strain the construction; no estates over limited only for
life. Can it be, that the word *survivor*, used in speaking of
the son to take after the death of his brother without issue,
is to have that effect? But such was the language in *Cha-
dock* v. *Cowley*, in *Webb* v. *Herring*, and *Hope* v. *Taylor*.
Though, in some cases of a devise of *personal* property,
the word *survivor* has been thought to give a restrictive con-
struction, it has never been held to have that effect in case
of a devise of an estate of inheritance. And in *Barlow* v.
*Salter*, Sir *William Grant* held, that the word *survivors*,
meant *others;* and that it could have no influence in varying
the construction of the other words. The *habendum* clause,
if it has any meaning at all, can only be satisfied by giving
to the sons estates in fee simple absolute. There are,
then, no such expressions, or circumstances, on which the
Supreme Court, in *Fosdick* v. *Cornell*, relied, to take this
case out of the operation of the established rule of con-
struction.

THE CHANCELLOR. This case turns upon the construc-
tion of the will of *Medcef Eden*, the elder.

The will was made in 1798, and the testator devised the
premises in dispute to his son *Joseph*, and to his heirs and
assigns for ever. He gave other lands, in like manner, to his
son *Medcef*, and then, in a subsequent part of the will, di-
rects, that " if either of his said sons should depart this life

---

of 1,000 *pounds, lawful money, unto the grantor or executors of M. H.,
or to such person as she, by her last will, shall direct.* The Court of K. B.
(*June,* 1818,) held that the words, *child or children*, must be construed
to mean issue. That the payment of the 1,000 pounds by *J. B.*
was a circumstance sufficient to show that the event contemplated by
the testatrix was a proximate, not a remote event, namely, a failure of
issue at *M. H.'s* death, and not an indefinite failure of issue; and,
therefore, that the devise to *M. H.* was not an estate tail, but in fee;
with a good executory devise over to *J. B.* in case the first devisee left
no issue living at her death.

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

without lawful issue, his share or part shall go to the sur-vivor ; and in case of both their deaths, without lawful issue, then he gave all the property over to his brother and sister, and their heirs."

After the testator's death his son *Joseph* entered, upon the lands devised to him, and having contracted debts, the premises were sold on execution, in 1802, and are now held by the plaintiff in error under that sale. In 1813, *Joseph* died without lawful issue, and his surviving brother, *Medcef*, claims under that proviso in the will, in opposition to the title of the plaintiff under the judgment and execution.

This may well be considered a grave and important question, demanding the utmost care and attention on the part of this Court ; for it was said upon the argument that property to the value of half a million of dollars depended upon the decision to be made in this case. For my part, I have not been insensible to this great responsibility, and to the duty which it imposed. I have studied the case as far as I was able, and with a most anxious desire to discover, if possible, that rule of construction which is applicable to this case, and which forms a part of the established law of the land.

Without the will, the defendant in error, *Medcef Eden*, took all the property that his brother *Joseph* died possessed of, as his heir at law. But *Medcef*'s title, as heir, would not reach the property in question, because *Joseph* had in his lifetime charged it with his debts, and suffered it to be sold on execution by a judgment creditor. It is necessary, therefore, for the defendant, *Medcef*, to claim under the will, and this he can do only by establishing that the proviso in the will, *that if either of my sons should depart this life with-out lawful issue, his share shall go to the survivor*, was a good limitation over to him, by way of executory devise. If he can succeed in that construction, then it follows, that *Joseph Eden* had only the use of the estate during his life, and could not sell it, nor charge it with his debts, and *Med-cef* would take the property, after his brother's death, in spite of the creditors. These executory devises, or limitations of estates by will, have some of the inconveniences of estates tail, as they lock the property up during the period

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

that the contingency may happen, without any power of alienation. Thus, if the land in question was intended by the will to go at all events to *Medcef*, if at the time of *Joseph's* death he had no issue then living, the land was locked up during *Joseph's* life, should he have lived an hundred years, as much as if it had been entailed estate. He could neither sell it, nor mortgage it, nor contract debts upon the credit of it, beyond his life interest, and the land would remain unalienable until after his death. This operation of executory devises, or, in other words, of contingent estates created by will, tended to fetter real estates by a species of perpetuity, and prevent them from circulating from owner to owner, as the ends of commerce, or the exigencies and wants of families might require. The Courts of Justice have, therefore, wisely and steadily determined that they would not permit these executory devises to tie up property beyond a moderate and reasonable period. They have determined that the contingency of an executory devise must happen within a life, or lives in being, and twenty-one years afterwards. This is the utmost length to which property can be so tied up by an executory devise; and if it attempts to go beyond that limit, it is void. This was the rule settled by Lord *Nottingham*, in the Duke of *Norfolk's* case, (3 *Ch. Cas.* 1.) in 1682, and the decision in that case has been acquiesced in uniformly since.

This rule is the cause of the struggle so often seen in the books, and witnessed in this very case, about the meaning of the words *dying without issue*, and whether they mean a dying without issue living at the very time of the death of the first taker, or whether they mean a general or indefinite failure of issue. I was surprised to hear it said, at the argument of this cause, that it was not easy to understand what was meant by an indefinite failure of issue. There is scarcely a case on the subject within the last two hundred years, but what mentions or alludes to this expression, and this extent of failure of issue. A definite failure of issue is when a precise time is fixed by the will for the failure of the issue. The time is then defined or definite. As, for instance, if the will in this case had declared that the property should pass over to *Medcef*, if *Joseph* had no issue

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

by the first day of *January*, 1810 ; or if, instead of saying in the words of the will, *and if he depart this life without lawful issue*, it had said, *and if my son Joseph shall die without having any issue living at the time of his death*, there could then have been no question but that here was intended a definite failure of issue. Now, a general or indefinite failure of issue is a proposition the very converse of the other, and means a failure of issue whenever it shall happen, sooner or later, without any fixed, certain, definite period within which it must happen. It means, when the issue or the descendants of the son shall become extinct, without reference to any particular time or any particular event. An executory devise upon such an indefinite failure of issue is void, because the period when the contingency on which the remainder over depends must happen, is too remote or uncertain. Such an executory devise might tie up property for generations, and lead to a perpetuity, or property perpetually unalienable.

If the words of the will would, as the law stood before our statute abolishing entails, have created an estate tail, then the defendant, *Medcef*, has no title under the will, for an estate tail necessarily implies issue in an indefinite succession, and the statute having turned estates tail into estates in fee simple absolute, the limitation over on failure of issue was void, as a contingent remainder. The defendant, *Medcef* must fail, then, if the plaintiff can establish that *Joseph Eden* would have taken an estate tail before 1786, or if he can establish, that these words, *depart this life without lawful issue*, do, by a settled, established legal construction, mean a general or indefinite failure of issue.

It has been repeated in the books, from case to case, that testators generally mean by the words *dying without issue*, or *departing this life without lawful issue*, or other words of similar import, a failure of issue at the time of the death of the devisee, and that they do not mean a general or indefinite failure of issue. This is said to be the meaning of the words in common parlance, or usage. I am rather inclined to think, however, that this notion of what the testator intended, has been borrowed by one judge from another, without much reflection or examination as to its truth. I doubt

the truth of the fact. I believe that when the Courts gave to those words the construction of an indefinite failure of issue, they did not depart from the sense of the will. It may be, that in many cases the construction was not what the testator meant, but it may equally be, that in many other cases the Courts would have counteracted his intention, if they had adopted any other construction. The intention generally is to give the property over to third persons only in the event of the son not leaving any family who may want to enjoy it. The testator can have no motive to fix the precise period of his son's *death*, as the æra at which the limitation is to be determined. He can have no pressing inducement to fix any definite period. He means to give the property to his son, and to his posterity, if he has any; but if he has none, or if his posterity becomes extinct, he means then, that the property shall go over to the next devisee, who is not so close to him as the son, and his posterity, but who, however, stands next in his affections. This is the popular and the rational meaning, for it is founded on the dictates of the heart. I incline to think, that in nineteen cases out of twenty, the testator really means a general or indefinite failure of issue. ⸳⸳⸳

Suppose, in this present case, the two sons, *Joseph* and *Medcef*, had died leaving lawful issue, and that issue had died within a few days after their respective deaths; on the defendant's construction the brother and sister of the testator could not take under the will. The event, on that supposition, did not happen on which the devise over was to take effect, for the sons did not die without lawful issue, but they died leaving lawful issue, and so the contingency on which the limitation over depended, failed. Could this possibly have been the meaning of *Medcef Eden*, when he made his will? Did he mean, that if his sons left issue, and that issue should survive them only one day, or one week, or one month, or one year, that then the devise over to his brother and sister should be void? The sister, in that case, would have been cut off entirely; for our statute of descents would not have reached the case, and the next heir of such issue, according to the common law, which would have governed the case, would have been the bro-

ther of the testator, and he would have succeeded to all the property, to the entire exclusion of the sister of the testator. It is certain that this could not have been the testator's intention; and that he did not mean to confine the devise over to the event of issue of his sons not living at the precise moment of their death. This would have been to cut off his sister's hopes and bounty, even if that issue, then living, should die the day after. And if he did not mean such a result, it follows, of course, that the will had reference to a general or indefinite failure of issue.

The words *dying without issue*, have a twofold meaning, said Lord Chancellor *Cowper*, in *Targett* v. *Grant*: (*Gilbert's Eq. Rep.* 149.) The one signifies a dying without issue at the time of one's death, and the other a dying without issue whenever such issue fails. The latter construction, he says, is applied to devises of land, so as to include all the succeeding issue; but in the case of a devise of a lease for years which cannot possibly descend to issue, there is no need of that construction, and the other prevails. In the case of *Jeffery* v. *Sprigge*, (1 *Cox's Cases*, 62.) where the construction of an indefinite failure of issue was applied to a devise over on dying without lawful issue, Lord *Thurlow's* words are, " nor do I know that this construction disappoints the testator's intention. I rather think he *meant* the remainder persons to take *whenever* there should be a failure of issue of the first taker."

There is great weight in the remark so frequently met with in the books, that in construing a devise, if it be made by words which have long received a particular technical construction, and thus become a rule of property, that construction ought to be observed, or we may unsettle the titles to estates long held under such a rule. Such rules become landmarks, and ought to be preserved, like ancient monuments or immemorial boundaries to land. There would be no safety in the transfer of property without an adherence to these rules. It is by the notoriety and stability of such rules that professional men can give safe advice to those who consult them, and people in general can venture with confidence to buy, and to trust, and to deal with each other.

IN ERROR.

ALBANY,
January. 1819.

ANDERSON
v
JACKSON.

There is another obvious maxim on this subject, and that is, that whether these executory devises be, or be not, too remote, depends upon the construction which the instrument ought to receive when it was made, and it is immaterial how the fact actually turns out. The possibility, at the creation of such executory limitations, that the event upon which their existence depends, *may* exceed the prescribed limits, vitiates them from the very beginning. If the words do not confine the will, at its commencement, and by clear distinct demonstration, to a failure of issue within the restricted time, the executory devise is absolutely void. Nothing which happens afterwards can vary the construction.

Having given these preliminary explanations, in order to be better understood in so dry and technical a discussion, I now proceed to consider whether *Joseph Eden* would not have taken an estate tail under this will, according to the law as it was known and understood when our act was passed abolishing entails, and whether the words of the will do not, by a settled construction, import an indefinite failure of issue.

The act of the 23d of *February*, 1786, abolishing entails, declared, " that in all cases where any person would, if the act had not been passed, at any time thereafter, become seised in fee tail of any lands by virtue of any devise before made, or thereafter to be made, such person instead of becoming seised thereof in fee tail, shall be deemed and adjudged to become seised thereof in fee simple absolute." If, then, *Joseph Eden* would have taken an estate tail under the will, provided the act of 1786 had not been passed. he must now be adjudged to take an estate in fee simple absolute. The statute is imperative, and renders it the duty of the Court so to adjudge in every such case. This leads us to the inquiry as to what estate *Joseph Eden* would have taken under the will as the law stood when the act of 1786 was passed. The statute puts that question upon the Court, and we must answer it. We are bound to adjudge that *Joseph Eden* took a fee simple absolute, provided he would have taken an estate tail, had not estates tail been abolished.

The act of 1786 was drawn with great skill and care, and it is one of the best digested laws in our statute book. In the three subsequent revisions of our laws, it was left un-

touched, and I hope it will long continue undisturbed, as a monument of the wisdom and discretion of the civilians and patriots who then swayed our public councils. The statute evidently shows a solicitude in the legislature to preserve the landmarks of real property as they had become settled by time and a course of judicial decisions. To know whether a person was to take an estate in fee simple under a deed or will, we are only to inquire whether he would have taken an estate tail without the act, and, if that be once ascertained, then we are to adjudge accordingly.

In obedience to this statute, I now proceed to examine, whether *Joseph Eden* would not, as the law stood before 1786, have taken an estate tail? ·**·

By the ancient common law, if a grant of land was made to a man, and *the heirs of his body*, the descent of the estate was confined to the heirs so described, and could not go to the collateral heirs. So, if the grant had been made to him, and the heirs *male* of his body, it excluded not only all the collateral heirs, but the females in the lineal line. Nor could the grantee alienate, so as to defeat the succession. But to give facility to alienations, the courts, at length, held, that estates of such limited succession were *conditional fees*, and that as soon as the grantee had issue, the condition was fulfilled, and the grantee might sell his land, or forfeit it, or charge it with incumbrances.

So stood the law in the year 1285, when the statute of entailments, commonly called the statute *de donis*, was passed in the 13th year of King *Edward* I., and this is the statute which was in force here, until our legislature passed the act abolishing entails.

The recital to that statute stated as a reason for passing it, that " where one giveth land to another, and *the heirs of his body*, it seemed very hard to the grantors, and their heirs, that their will expressed in the grant should not be observed. Instead of which, after issue born, the grantee had power to aliene his land contrary to the mind of the giver, and contrary to the form of the gift." The statute then ordained, " that the will of the giver, according to the form in the deed of gift manifestly expressed, should be observed, so that those to whom the land was given under such condition,

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

shall have no power to aliene the land so given, but it shall remain unto *the issue* of them to whom it was given, after their death, or shall revert to the donor, or his heirs, *if issue fail.*"

Under this statute, a series of judicial decisions were made, arising upon deeds and wills, establishing when, and by what words an estate tail was created within the meaning and operation of that statute. These decisions, as we may well suppose, are very numerous, and occupy a space of 500 years, in the busy affairs of mankind, between the passing of that statute, and the act of our legislature abolishing entails.

I shall notice only a few of the most important cases, but sufficient, as I apprehend, to show the uniform construction of certain words creating an estate tail, and the steady hand with which the courts uphold the construction, in order to render the rules of property known, and certain.

It was the command of the statute, that probably led the courts to give a uniform construction to the words in a deed, or will, *dying without issue ;* for the statute said, that the land should remain unto *the issue* of the grantee, until such *issue fail.*

In a case in the book of *Assise,* (35 *Ed.* III. pl. 14.) lands were given by deed to *B.*, and his heirs, forever, provided *B. had issue of his body* begotten, and if he *died without heir of his body,* the land was to revert to the donor, and his heirs. *B.* died without issue, and the question was, whether *B.* took an estate tail, or a fee simple ; the suit was between the collateral heir of *B.*, and the heir of the donor, and the K. B. adjudged, that *B.* took an estate tail.

This is the earliest case we meet with under the statute *de donis,* and there is considerable analogy between that case, and the present one, though that case arose under a deed, long before the statute of wills. In that case *B.* had had a deed to him, and his heirs forever, as in the present case the devise is to *Joseph Eden,* and his heirs, forever ; but in that case, it was provided, that *if B. died without heirs, or issue of his body,* the land was to revert, and this was held to cut down the fee simple to a fee tail. So, in the present case, it was provided, that if *Joseph should depart this life*

*without lawful issue*, his share was to go to the survivor. To die without issue of his body, and to depart this life without lawful issue, appear to me to be quite synonymous, and to demand the same construction. If *B.* took an estate tail under that deed, I should think that *Joseph Eden* took an estate tail under this will, unless the rules of construction have been since altered, or the same rules do not apply to deeds and wills.

I proceed, then, to show what has been the construction of such language in wills, since the passing of the statute of wills; and several cases of this kind arose in the time of *James* I.

In *Sonday's case*, (9 *Co.* 127.) it was resolved, that if a man devise lands to his son *T.*, but *if he have no issue male*, his son *R.* shall have it, this was the same as if he had said, if *T. die without male issue*, which words are sufficient to create an estate tail. So, again, in the case of *King* v. *Rumball*, (*Cro. Jac.* 448.) a devise of lands was to the wife, for life, remainder to his three daughters, equally to be divided, and *if any of them die before the others, then the others to be her heirs*, and if they all *die without issue*, remainder over. It was held, that the daughters took vested estates tail.

Here, then, were two cases in the time of *James* I. arising under a will, in which it was held, that a devise to a person, and if he *die without male issue*, or die *without issue*, then remainder over to another, this gave him an estate tail. This is the same rule of construction applied to wills which was originally applied to a deed, and the cases are entirely applicable to the one before us, for to *depart this life without lawful issue*, is the same precisely, as to *die without issue*. There is no possible difference in the meaning.

The next case, in point of time, is that of *Pells* v. *Brown*, (*Cro. Jac.* 590 ) which arose only two years after the case already cited, and before the same judges. This case has been greatly relied upon in support of the judgment of the Supreme Court, and it has been cited to prove, that *Joseph Eden* took by the will, not an estate tail, but an estate in fee, on which the limitation over is good, by way of executory devise.

The testator, in that case, devised his land to his son *T.* and *his heirs forever, paying to his brother R.* 20 *pounds,* when of age, and if *T. died without issue living, W. his bro-ther,* then the devise was to *W.* and his heirs and assigns, he paying the 20 pounds to *R.* The K. B. held, that *T.* took an estate in fee, and not an estate tail, and they relied on the fact, that he was directed to pay the legacy to *R.* which implied a fee, and because the clause, *if he died without is-sue,* was not absolute, and indefinite, for the will added, if he died without issue *living W.* " He might survive *W.,* or have issue alive at the time of his death, living *W.,* in which cases *W.* should never have it, but he was only to have it, if *T.* died, without issue, *living W.*"

This case of *Pells & Brown,* was decided upon the strong and peculiar expressions in the will, showing, that the testa-tor clearly, and decidedly referred to his son's death as the period which was to determine the contingency of the ex-ecutory devise. The Court say, that the words, and *if he died without issue,* were not indefinite, because they were qualified with a contingency in that case, viz : if he died without issue *living William.* The case, therefore, has ne-ver been deemed to have any authority beyond such a spe-cial case. We have seen, that the same Court, only two years before, decided, that the words *dying without issue,* made an estate tail, and we find also, that the same Court, with a part of the same Judges, only five years afterwards, in *Chadock* v. *Cowly,* (*Cro. Jac.* 695.) made a similar de-cision. In that case, there was a devise of lands to *A.* and *B.* severally in fee, and that the *survivor* should *be heir to the other, if either of them died without issue,* and the Court held, that *A.* and *B.* took estates tail with cross remainders over in fee. This last case is like the present in almost every particular. In both cases, there were devises to the two sons severally in fee, and in both cases, the survivor was to take, if the other died without issue. In the case in *Croke,* the surviving brother was to take, if the other *died without issue.* In the present case, the surviving brother was to take, if the other *departed this life without lawful is-sue.* Here, then, are two cases, in two distant ages, so per-fectly alike, that the wit of man cannot create a distinction ;

IN ERROR.
·······
ALBANY,
Janua., 1819.

ANDERSON
v.
JACKSON.

CASES IN THE COURT OF ERRORS

IN ERROR.
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

it would seem, then,-to be inevitable, that the one case must be an authority for the construction of the other. The Court in that case, observed, that if the devise had been, that if he had died without issue *in the life of the other*, or *before such an age*, that then, peradventure, there might have been a contingent estate, but when the words were, that the survivor should be heir to the other, if he died without issue, the *interest* was an absolute vested estate tail.

It is worthy of notice, that the Court here speak of the *intention* of the testator to create an estate tail, with an indefinite failure of issue ; and this case shows, that the preceding case of *Pells & Brown* had not altered the general tenor of the rule of construction on this point. Here I cannot but notice, that it has been very much the fashion, in some late cases, to eulogize this case of *Pells & Brown* ; and I apprehend the encomium has been entirely borrowed from what Lord *Kenyon* said, in *Potter* v. *Bradley*, (3 *Term Rep.* 146.) where he extols the case, (and as I think, very unnecessarily and very extravagantly,) as the *magna charta* of this branch of the law. Nay, he says, that doctrine has never since been doubted. We find, however, in *Jay* v. *Jay*, (*Styles*, 274.) in the year 1651, it is asserted, that there was so much apparent inconvenience in that case, that the Court was, afterwards, divided, and that it had ever since been disputable ; and it was said by Mr. *Latch*, that it was adjudged upon solemn argument, at the bar and on the bench, contrary to the judgment in *Pells & Brown's* case. So, afterwards, in *Plunket* v. *Homes*, (1 *Sid.* 47.) it was observed by the Court of K. B., that although the case of *Pells* v. *Brown* was not by them denied, yet that the case had never been well approved, and that it was dangerous to enlarge such executory devises, which could not be barred, seeing that they tend to support perpetuities. We find, also, in the celebrated case of the Duke of *Norfolk*, (3 *Ch. Cas.* 1.) that Chief B. *Montague* suggests a doubt, whether the case of *Pells* and *Brown* be good law, and Lord Chancellor *Nottingham* takes occasion to support it, by referring to a prior case of *Hinde* v. *Lyon*, in *Leonard*. It is not my purpose to interfere with the authority of the case of *Pells* and *Brown*, but how Lord *Kenyon's* eulogy upon that case can be .

reconciled with these subsequent doubts and strictures, IN ERROR.
I leave to those who have chosen to adopt his Lordship's ·······
words, to explain.

But to proceed with the cases: the next that I shall
cite is that of *Holmes* v. *Meynel*, (*T. Reym.* 452.) in the
33d of *Car.* II. The devise there was to two daughters and
their heirs, equally to be divided between them, and in case
they happen to *die without issue*, devise over to *F.* It
was held by the K. B. that the daughters took several estates
tail; for though the devise was to them and their heirs in
the beginning, yet when the will, afterwards, said, *and if they
die without issue*, it showed that the word heirs was intend-
ed *heirs of their bodies*, and when the issue of one failed, the
other took by way of cross remainder. This is a case, also,
exceedingly analagous to the one before us.

In *Forth* v. *Chapman*, (1 *P. Williams*, 663.) which was in
1720, the devise was of both real and personal estate to *A.*
and *B.*, and if either should *depart this life, and leave no
issue of their respective bodies*, then a devise over of the
leasehold property. Sir *Joseph Jekyll* here held, that even
the devise over of the personal property was void, as
being on an indefinite failure of issue; but on appeal to
the Chancellor, Lord *Macclesfield*, a distinction was taken
between such an executory devise of real and personal
property; and that in the former case the words *dying with-
out issue*, made an estate tail, because the words meant an
indefinite failure of issue; but that in respect to personal
property, which was transient and perishable, the testator
could not have intended a general failure of issue, and,
therefore, in regard to that species of property, the testator
must have meant, without issue *at the death* of the first taker.

This distinction has been recognized in many subsequent
cases, and particularly by such high authorities as Lord
*Hardwicke*, Lord *Mansfield*, and Lord *Eldon*. (3 *Atk.* 288.
2 *Ves.* 610: 180. 125. *Cowp.* 410. 9 *Ves.* 197. 203.(
But even in respect to such a bequest of pesonal property,
there is much difference between the cases; (*Beauclerk* v.
*Dormer*, 2 *Atk.* 308. *Hughes* v. *Sayer*, 1 *P. Wms.* 584.
*Nicholls* v. *Skinner, Prec. in Ch.* 528. *Nicholls* v. *Hooper*,
1 *P. Wms.* 198. *Bigge* v. *Bensley*, 1 *Bro.* 188. 2 *Fearne*,

ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

IN ERROR.

........

ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

by *Powell,* 259. *Keily* v. *Fowler,* 6 *Bro.* P. C. 309. *At-kinson* v. *Hutchinson,* 3 P. *Wms* 258.) and I think the weight of authority decidedly is, that the words, *dying without issue,* standing without other circumstances of intention, mean here also, a general or indefinite failure of issue, and that the limitation over would be void.   But we have nothing to do, at present, with the cases touching personal property    It is sufficient to observe, that *all* these cases agree, that as to a devise of *real* property, the words mean an indefinite failure of issue ; and Lord *Thurlow* says, there is not a case in the law, (and he said there were 57 cases on the point,) which does not hold that such a limitation over, after those general words, *dying without issue,* is too remote, and, consequently, void.

But I hasten to mention a few more prominent cases, as being requisite to show the steady progress and firm step of the *English* Courts in one and the same direction.

In *Brice* v. *Smith,* (*Willes's Rep.* 1.) decided by Lord Ch. Justice *Willes,* in 1737, the devise was to *A* and his heirs for ever, and if he should *die without issue,* then to his right heirs, and it was held that *A.* took an estate tail. In this case the Chief Justice observed, that " it cannot be doubted now, after so many solemn resolutions, but that if a man devise an estate to *A.* and his heirs, and, afterwards, in his will gives his estate to another, in case *A. dies without issue,* that those subsequent words reduce *A.'s* estate to an estate tail."    And, afterwards, in *Hope* v. *Taylor,* (1 *Burr.* 268.) Lord *Mansfield* thought it a clear point, that the words *dying without issue lawfully begotten,* in a devise of land, created an estate tail.

We ought constantly to bear in mind, as we go along, that all these cases are perfectly in point ; for in the present case an estate in fee was first given to *Joseph Eden,* and then came the words, *if he depart this life without lawful issue.* What *English* Court, for the last three hundred years, would have hesitated for one moment in saying, *this, then, must be an estate tail ?*

Again, in *Doe* v. *Fonnereau,* (*Doug.* 504.) which was in the year 1780, Lord *Mansfield,* asked the learned and experienced sergeant *Hill,* whether he had ever been able to

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

find a case of real property where the Court, on the words *in default of such issue,* had restricted the words to issue *living at the death of the first taker;* and Lord *Mansfield* afterwards said, in the name of the Court, that they could find no case where, in a will of real property, the Court had confined the *failure of issue to the life* of the ancestor.

We have now traced the history of the *English* law on the question, through a series of the most important decisions, (for I have noticed only the most striking,) from the reign of *James* I. down to the time of the passing of the first act of our legislature, in 1782, abolishing entails: and what can we suppose that the legislature meant, by fee-tails, when they required the courts to adjudge, that whoever would thereafter, without that act, by virtue of any devise, have been seized in fee tail, shall be deemed and adjudged to be seised in fee simple absolute? Surely, they had reference to this settled, uniform, universal sense of the then existing law on the construction of wills. These rules of construction had become axioms of law. They constituted a part of title to land. They were the guards and landmarks of freehold estates, held under wills. They were well known to those distinguished revolutionary lawyers, who framed that law. They had regulated the title by devise in their day, and in that of their ancestors, and as far as the legislature could dictate, those maxims and rules were to be transmitted to posterity : *Et nati natorum, et qui nascentur ab illis.*

If we follow the course of the *English* decisions since the year 1782, we shall find that the rule of construction, creating an estate tail, by will, has been steadily continued to this day. ° ° °

In *Denn* v. *Slater,* (5 *Term Rep.* 335.) there was a devise to *B.;* and if he *died without male heir,* then to *C.* and his heirs, and Lord *Kenyon* said it was clear, from all the cases, that *B.* took an estate tail. So, in *Doe* v. *Rivers,* (7 *Term Rep.* 276.) the devise was to *A.* and her heirs; and if she should *die without issue,* then over to others; and it was held, that *A.* took an estate tail. Afterwards, in *Doe* v. *Ellis,* (9 *East,* 382.) there was a devise to *T.* and his heirs and assigns, forever; but if *he should die without issue,* then to

a third person in fee. It was held, that *T.* took an estate tail, and Lord *Ellenborough* observed, that the general rule was clear, that the words must be construed to mean a general failure of issue. He adopted the remark of Lord *Thurlow*, that the general words were to be " varied only by circumstances arising on fair demonstration ;" and he said, that to consider the words as importing a dying without issue, *at the time of the death* of the devisee, would be against all the cases.

The next case I shall refer to is *Tenny* v. *Agar*, (12 *East*, 253.) which is as late as 1810 ; it is a very strong case on the point, and one that asserted and adjudged that the testator clearly intended an indefinite failure of issue.

The devise was to a son in fee, upon condition that he paid a legacy to a daughter, and on default, then to her in fee ; and *in case the son and daughter both died, without leaving any child or issue,* then the testator devises the inheritance over to his cousin. It was held, that the devise over was not an executory devise, but a remainder, limited after successive *estates tail ;* and Lord *Ellenborough* said the intention there was clear, that the devise over was not to take effect until all the issue of the son and daughter were extinct. The other judges of the King's Bench expressed themselves to the same effect. *Le Blanc,* J. said there was no case where the words *dying without leaving issue,* had been adjudged to mean leaving issue *at the time of his death* ; and *Bayley,* J. said, that to construe the words as referring to an indefinite failure best answered the intent. The words must be construed as narrowing the devise in fee, in the first part of the will, to an estate tail, unless it appeared clearly to have been the testator's intention to look to the event of a dying without leaving issue, *at the time of his son's death,* instead of an indefinite failure of issue. He then supposed the case, that the son had died leaving issue, and which issue had died immediately after, and concluded, that it could not be the testator's meaning, that the devise over should, in such an event, absolutely fail ; and yet it must have failed, if the contingency depended on the son's dying without leaving issue *at the moment of his death.* The meaning was, and, as I have already observed, the meaning

in most cases is, that the devise over shall take effect when the son dies, and *his issue fails*, let it fail when it may, whether before, or at, or after the son's death; and this is what we understand by an indefinite failure of issue.

IN ERROR.
.....
ALBANY,
January, 1812.

ANDERSON
v
JACKSON.

If we pass from the decisions in the courts of law to the late decisions in the *English* chancery, we shall meet with the same acknowledged rule.

Thus, in *Kirkpatrick* v. *Kilpatrick*, (13 *Vesey*, 476.) which was in 1807, the case arose on a will of personal property, which is not applicable; and besides, the inclination of the courts have been there to confine the contingency on which the bequest over was to take place, to the death of the first taker; for it is not probable that a testator could have intended any very remote limitation of fluctuating personal property; yet, even there, the counsel for the plaintiffs admitted, that the words, dying without issue, had received an established judicial sense, and unless controlled by the intention appearing from other parts of the will, they must be understood as an indefinite failure of issue. The counsel on the other side insisted, that even the intention there was according to that construction, and that the testator meant to give the property over, only in the event of the son not *having a family who might want it,* and that he could not have had the extraordinary intention, that if one son should die leaving issue, the bequest over to the surviving son should, at all events, fail, and the property go to some remote relation, though the issue should not happen to survive the parent for a month.

This case was determined upon the particular provisions in the will, and did not touch the point on the effect of the general words, *dying without issue,* and I have only referred to it as evidence of the sense of the profession on the subject. But *Barlow* v. *Slater,* (17 *Vesey,* 479.) decided in chancery in 1810, is quite applicable to the present case. The devise there was of real and personal estate, to a daughter and her heirs, forever, but in case she *died without issue,* then to the nephew and nieces; and the part of *C.,* one of the nieces, was only for life. Upon this case, the Master of the Rolls said, it was settled, that unless there are expressions or circumstances from which it can be collected that those

words were used in a more confined sense, they were to have their legal signification, viz : death without issue, generally ; and that, in that case, there were no circumstances or expressions, to limit the generality of the words from a failure of issue indefinitely, to a failure of issue *at the time of the death.* The limitation over was, therefore, held to be too remote, and the daughter took an estate tail.

The case here cited is much in point with the one before us. It is a much stronger case ; for there were circumstances in that will against the construction of an indefinite failure of issue, which do not exist in the present case. The remainder over to one of the nieces was for life, and it might reasonably have been supposed that the testator could not have contemplated a devise over to one of his nieces for her life only, after an event probably so remote as an indefinite failure of issue in his daughter. But the Master of the Rolls replied, that such a circumstance had never altered the construction. The failure *might* happen during the life of the niece, and that chance was given to her.

The last case I shall cite from the *English* books, in support of this rule, is that of *Romilly* v. *James,* (6 *Taunt.* 263.) decided in the C. B. before the present distinguished Chief Justice *Gibbs,* as late as 1815. The devise was to a nephew, of all the estate, to hold to him and his heirs forever ; and if he should *die leaving no issue of his body,* then to *C.* in fee. It was held, that the nephew did not take a defeasible fee simple, with an executory devise over, as was urged in that case, and, as has been decided in the present case, by the judgment of the Supreme Court. The Chief Justice said they had no authority for supporting such a construction, but it was held that the nephew took an estate tail.

I have thus continued the history of the *English* decisions, from the time that we abolished estates tail, down to the present moment ; and it must have been perceived, that there is one uniform, undisturbed current of authority, as well since, as before our statute, declaring and establishing that such words as are used in the will of *Medcef Eden,* the elder, do create an estate tail ; that they do mean an indefinite failure of issue ; that the devise over, on failure of issue, is not good in such cases, by way of executory de-

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

vise, because it would render the property too long unalienable, and tend to create a perpetuity ; that the devise over to *Medcef*, the surviving brother, was good only as a contingent remainder, and that as we are bound by our statute to adjudge a fee tail, such as this would have been without the statute, a fee simple absolute, the whole remainder falls to the ground, and *Joseph* was seized in fee. The consequence is, that *Joseph* had a right to alienate the property, and had a right to charge it with his debts, and, therefore, the title of the plaintiff in error, founded on the judgment and execution against *Joseph*, is valid in law.

But if the decisions have been as settled and uniform as I have stated, it may be asked, how came the Supreme Court to make such a decision as that now under review? I answer, that the present case was decided without going into any discussion of the merits, and by a reference merely to one or two former cases in the Supreme Court, all of which rested upon the case of *Fosdick* v. *Cornell*, (1 *Johns. Rep.* 440.) decided by that court, in *August*, 1806. I was, at that time, Chief Justice of the Supreme Court; and though I did not give the opinion, I will not shelter myself under that silence. I am free to say that I partook of its error. But I should be unworthy of public confidence, if, with more experience and more examination, having detected myself in an error, I should now be ashamed to confess it. I discovered, years ago, that the case of *Fosdick* v. *Cornell* was decided upon mistaken grounds. The Court, however, have this apology for themselves, that without much examination, and without looking, as they ought to have done, deeply into the subject, they were led astray out of the beaten track, by such a distinguished leader as Lord *Kenyon*. The cases of *Porter* v. *Bradley*, (3 *Term Rep.* 143.) and of *Roe* v. *Jeffery*, (7 *Term Rep.* 589.) were the blind guides that misled them. I say this, confidently, for the Court do nothing more in the whole opinion, than repeat what Lord *Kenyon* had spoken.

The case of *Porter* v. *Bradley* was decided, as late as 1789, and, therefore, ought not to have been regarded as an authority, when it departed from all the preceding decisions. The Court there held, that if lands be devised to *A.* and his

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

heirs, and if he *die leaving no issue behind him*, the limitation over was good by way of executory devise. Now, the case itself might, perhaps, be left to stand; for Lord *Kenyon* relied upon some special provisions in the will, and particularly upon the peculiar phrase in that will, if he should die leaving no issue *behind him*. Those words, he thought, brought the case within the old decision in *Pells* v. *Brown*, where the words were, if he should die without issue, *living William;* and the testator was supposed, in that case, to refer to a dying without issue, *living at his death.* We have already seen how that case of *Pell* v. *Brown* was attacked and questioned, again and again, for seventy years afterwards, and yet Lord *Kenyon* called that case the *Magna Charta* of this branch of the law, and that the doctrine in it had never been questioned. But Lord *Kenyon* went farther; he thought that if the words had only been *leaving no issue,* they ought not to have been taken to mean an indefinite failure of issue. Now, all this was a mere *dictum* of that single judge; and Mr. *Fearne* supposes that the case must have been decided on the particular words peculiar to the case, and that it could not be supposed that Lord *Kenyon* would, otherwise, " have dismissed all attention to the antecedent decisions upon the point." Lord *Eldon* expressed himself more strongly, and said, (9 *Vesey*, 203.) " when I read the case of *Porter* v. *Bradley,* speaking with all due deference to the learned judge who expressed that *dictum,* it appeared to me, that it went to shake settled rules to their very foundation."

In a few years afterwards, in *Duentry* v. *Duentry,* (6 *Term Rep.* 307.) it would seem, as if Lord *Kenyon* and the King's Bench had reinstated the broken rule. The devise there, was to the son and heirs of his body, of all the testator's real and personal estate, and if he *should happen to die without leaving issue of his body,* then the devise over was to *B.* Upon such a case the court held that the son took an estate tail in the real estate, but that the devise over of the personal estate was good by way of executory devise; that is, the words without leaving issue of his body, meant an indefinite failure of issue, as applied to the real estate; and as applied to the personal estate, the words were to be confined to leaving issue at the time of

his death. It is remarkable, that Lord *Kenyon*, in this
case, relies upon the authority of *Forth* v. *Chapman* for that
very distinction, when, in the preceding case of *Porter* v.
*Bradley*, he had attacked that very decision and distinction,
as unreasonable and unfounded.

The next case of *Roe* v. *Jeffery*, (7 *Term Rep.* 589.) was
decided by Lord *Kenyon*, in 1798, and he professed to go
upon principles that had not been disputed for a century.
But his doctrine, in *Porter* v. *Bradley*, was attacked, with
very great force and ability, by the learned counsel; and
Lord *Kenyon* was obliged to say, that he had not given any
judicial opinion respecting the distinction taken in *Forth* v.
*Chapman*; and that, if it had become a settled rule of pro-
perty, it might be dangerous to overturn it. The case itself,
of *Roe* v. *Jeffery*, did not mean to touch the established rule;
and it was decided, upon the special provision in the will,
that if *the grandson departed this life and left no issue*, the
property was to *return* unto three daughters, *then living*, for
*life* only. On these circumstances, the court decided that
case, as forming a clear intention to confine the failure of
issue to the death of the devisee, and that it could not be
presumed that the testator intended a devise for life to a
person then living, to begin after an indefinite failure of
issue.

These two decisions, under Lord *Kenyon*, are the ground
of the decision in this state, and yet we now perceive how
inaccurate, and how inconsistent, Lord *Kenyon* has been
on this point; and that the *English* courts of law and equity
have since regained and pursued their accustomed course.
Some of the observations of Ch. J. *Wilmot*, in the case of
*Keily* v. *Fowler*, (2 *Fearne*, by *Powell*, 236. 6 *Bro. P. C.*
309.) were cited upon the argument, in support of the judg-
ment; but it is sufficient to observe that the question in that
case, arose on a bequest of personal property; and, there-
fore, the case has no application. The Courts, in respect to
these limitations over of personal estates, have discovered an
anxiety to support them, by laying hold of any circumstance,
however slight, and by drawing almost imperceptible shades
of distinction. The remarks of Ch. J. *Wilmot* may be re-
ferred to this distinction, and yet the reasoning of the coun-

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

sel for the appellants, in that very case, may be quoted as of serious weight against the policy of executory devises in the case of children. These executory devises suspend the power of alienation and ownership, till the contingency is determined in the very moment, and by the event of the death of the child. This disables a child from disposing of any part of the property, in the course of a long life, either to educate his own offspring, or to advance them upon their marriage, or to contract debts necessary to support him in business, or under misfortunes. And I should think that sound policy (and the very policy that dictated the act abolishing entails) would lead us not to give any great encouragement to the doctrine of executory devises.

It is not pretended that a testator cannot create an executory devise when he pleases, but he must then use language that is clear and certain, so that his intention cannot be mistaken. Of this we have an example in *Target* v. *Gaunt*, (1 *P. Wms.* 432.) where the devise was to A. for life, and no longer, and after his death, to such of his issue as he by will should appoint; and in case he died *without issue*, then a limitation over. Here it was held (and by the same Lord Chancellor *Macclesfield* who had so emphatically declared the distinction between real and personal estate) that the testator meant issue living *at his death*, because it was to such issue as he should, by will, designate, which must have referred to issue then living.

Before I conclude, I must be permitted, very briefly, to show how the law we are discussing has been considered in these *American* states, though I am sensible I have occupied too much time already. My apology must be found in the abstruse nature of the subject, and the deep interest involved in the contest.

The case of *Richardson* v. *Noyes*, (2 *Tyng*, 56.) was decided by the supreme court of *Massachusetts*, in 1806. The devise was to three sons, and if either of them should die without children, the survivor was to take his share; and this applied not only to the land, but to the tools of husbandry, and the negroes belonging to the testator. Mr. J. *Sedgwick*, who gave the opinion of the court, admitted the general rule, that if a devise be to A., and if he die *without issue*,

or *without children*, then the devise over, he would, by the
*English* law, take an estate tail. But he relied upon the
word children, and very much upon the circumstance in that
case, that the tools of husbandry, and the negroes, were
made to vest in remainder upon the same event; and he
held this to be decisive evidence of an intention to confine
the limitation over to issue living at the death. This case,
then, is an authority for the general rule, when the will, like
the one before us, has not any such special circumstance to
mark the intention. But the decision was, I apprehend,
according to the *English* law, a mistaken one, in not follow-
ing the rule in *Forth* v. *Chapman*, which would have made
a distinction as to the construction of the will between the
devise of the real, and the bequest of the personal estate;
and, considering the different nature of these two estates,
I think the distinction is solid. I perceive, also, in this
*Massachusetts* case, that the learned judge was under the
influence of Lord *Kenyon's* decision, for he calls the ancient
case of *Pells* v. *Brown*, a famous case, and a *magna charta*
on the subject.

The next case from the *Massachusetts* reports is that of
*Ray* v. *Enslin*, (2 *Tyng*, 554.) in which there was a devise
to a daughter and her heirs; *but if she should happen to die
before she came of age, or have lawful heirs of her body*, then
the devise over. The words of that will render it a case
altogether inapplicable, and I only refer to it for the princi-
ple contended for on one side, and admitted by the counsel
on the other, that if the devise had been to the daughter,
*and if she died without issue*, then over, it would have been
an estate tail, and that the remainder over would not have
been good, by way of executory devise, because it would
have been after an indefinite failure of issue.

But afterwards, in *Ide* v. *Ide*, (5 *Tyng*, 500.) the doc-
trine came under the consideration of that great lawyer, Ch.
J. *Parsons*; and in delivering the opinion of the court, he
observed, that it was a settled rule of construction, that in a
devise of land in fee to A. with a devise over, if he *die with-
out issue*, or *without leaving issue*, the first devisee takes an
estate tail, and that on this construction, the words *dying*

IN ERROR.
. . . . . . .
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

*without issue,* or *dying without leaving issue,* mean an indefinite failure of issue. He added, that if there had been no other words in that will, that construction would have prevailed; but the case was determined on other expressions in the will, which do not exist in the present case, and, therefore, have no application.

Here, then, we have, in the Supreme Court of *Massachusetts,* a very explicit recognition of the doctrine for which the plaintiff in error contends.

This same subject was very much discussed in the Supreme Court of *Pennsylvania,* in the case of *Hauer* v. *Shitz,* (3 *Yates' Rep.* 205.) but that case turned upon the construction of peculiar provisions in a will which are not at all analogous. That case did not proceed upon the ground that the words *dying without issue* could not, *per se,* refer to an indefinite failure of issue, but the judges thought that the circumstances annexed to the devise took the case out of the general rule. The authority of the general rule seemed to be assumed, and Mr. J. *Yeates* said expressly, that he took the correct rule to be, that where there was a limitation even of real estate on a *dying without issue* generally, without other words expressly restrictive of their operation, that such expressions ought to be construed an indefinite failure of issue, and the limitation over as too remote. " This," he said " had been abundantly shown, and that there existed a clear distinction in the construction of limitations over of real and personal estates in *England.*"

If we proceed to the courts of other states, further south, we shall meet with still more evidence of the validity of the rule, and of its universal adoption. ° * ˙

In the case of *Hunter* v. *Haynes,* (1 *Wash. Rep.* 71.) decided in a *Virginia* court of appeals, in 1792, the devise was to a nephew and the heirs of his body lawfully begotten, for ever; but if he should *die without such issue,* then to the testator's brother in fee. The nephew died without issue; but the court held that the remainder over did not then take effect, and that the estate descended to the collateral heir of the devisee. So again, in the case of *Royall* v. *Eppes,* (2 *Munf.* 479.) decided as late as 1811, by the Supreme Court of Appeals, the devise was to the son, and, *in case he died*

IN ERROR.
........
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

*without heir of his body lawfully begotten, that then, and in that case,* a devise over. The court said that they were clearly of opinion that in relation to land, there was nothing in the will that would restrict the limitation from an indefinite failure of issue, to a failure of issue at the time of the death; though, in respect to a devise over of personal property, viz. negroes, they thought there were special words in the will that would justify the adoption of the restrictive construction.

In *Virginia*, therefore, as well as in *Massachusetts* and *Pennsylvania*, the *English* rule is the acknowledged law of the land.

In *North Carolina*, the same rule prevails, as appears by the case of *Denn, ex dem. Sutton and Wife*, v. *Wood*, (*Cameron & Nor. Rep.* 202.) decided in their highest court, called the Court of Conference, in 1801. This is a very strong case, and remarkably applicable, in many points, to the one now before us.

The words of the will were, that " If either of my two sons, *C.* or *L.* should die without lawful issue begotten of their bodies, then my son *J.* shall have the lands of the one so first dying; and, in that case, I devise the same to him in fee." After the father's death, *C.* entered upon the lands devised to him, and died without issue, leaving his brother *L.* and his brother *J.* surviving; but he made his will and devised the lands to his wife. The contest there was between the wife and the surviving brother, *J.*, in like manner as the contest here is between a creditor and the surviving brother. The cases are, therefore, on all essential points, perfectly alike. Judge *Hall* held, that by the words of the will, it was a dying with an indefinite failure of issue, which might happen at any distant period, and not an event which must necessarily take place in any reasonable time, and, therefore, it was too remote, and not good by way of executory devise; but it was an estate tail created in *C.* That though the fact was, that *C.* died without issue at the time of his death, it did not alter the case; for the same construction must then be made upon the will as would have been made upon it at the testator's death. That if an estate tail was created in *C.*, the act of 1784 converted it into a

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

fee simple, and *C.* had a right to devise it to his wife, and, therefore, she was entitled to the judgment.

Here, then, we perceive another circumstance in the case agreeing with the one before the court; I mean the act of the *North Carolina* legislature, passed about the same time with our statute, converting estates tail into estates in fee; and if we were to turn over all the law books in the *English* language, we could not find two cases more entirely parallel. But to proceed with the case: Judge *Johnston,* another of the judges of the Court of Conference, observed, that before the act of 1784, the devise over would have been a contingent remainder, and not an executory devise. And the limitation on the death of either of the brothers was not confined to his dying without issue in the life of the survivor, but would take place, on a failure of issue, at any future period of time, however distant. That under the will, according to the act of 1784, *C.* took an estate in fee; and the devise over to *J.* was void, the contingency upon which it was to take effect being too remote. *Taylor,* J. also observed, that the question was, whether the limitation over to *J.* was ineffectual as an executory devise; that *C.,* before the act of 1784, would have taken an estate *tail,* but in consequence of that act the estate devised to him was a fee simple; that the limitation over was to take effect after an indefinite failure of issue of the brother who died last; and that the intention clearly was that the devise over to *J.* should not take effect as long as there was any issue of the son who should die first; that, consequently, if one of the sons had died leaving issue, which should afterwards fail in any indefinite period of time, living the issue of the other son, the limitation over would take effect, if the intention of the testator consisted with the rules of law; but it did not, for it was a limitation upon an unrestricted failure of issue, which would work a perpetuity. He concluded by saying, that it did not appear to him that the case was to be distinguished in its material circumstances, from *Forth* v. *Chapman,* to which we have already frequently alluded.

The fourth and last judge of the court, Mr. J. *Macay,* agreed, in all respects, with the other judges; and so, by the

judgment of the whole court, the disposition of the property
by *C.* was held valid.

The same question has frequently arisen, and been discussed in the courts of *South Carolina*, and the settled rule of construction of the words, *dying without issue*, uniformly acknowledged.

Thus, in *Keating* v. *Reynolds*, (1 *Bay's Rep*. 80.) the question arose on a devise of chattels to the testator's two daughters, and it was there admitted, that the general words, *that if either should die without lawful heirs of their bodies*, appeared to look to an indefinite failure of issue; but they held that the subsequent words, without lawful heir of their bodies *to live*, controlled the general words, and made a good limitation over, by way of executory devise.   Though this was a case of a will of chattels only, yet we perceive the operation of the general rule, and the necessity of special words to vary the intent.   The same general rule was admitted, in *Jones* v. *Rice*, (3 *Desauss. Rep*. 165.) which was also a case of a bequest of chattels, and where the Court found words to controul the general intent.   But in *Cruger* v. *Hayward*, (2 *Desauss*. 94.) there was a devise to the son, of land, with the slaves and stock thereon; and in case he *died without issue*, then a devise over.   Chancellor *Rutledge*, who delivered the opinion of the Court of Chancery, said there was no doubt that if the statute of entails was of force in that State, but that the son would have had an estate tail on the land, for he said, it was laid down clearly in the books, that if lands are devised to one, and if he die before or without issue, or not leaving issue, it is devised over, these limitations create an estate tail; but that statute not being in force, the son took a fee conditional at common law. This last remark cannot apply here, for our statute declares that the devisee in such case, shall take, not a fee conditional, but a " fee simple absolute ;" and so strictly did the court in *South Carolina* adhere to the general rule of construction, that it was applied there even to the devise of the negroes and stock on the farm; for the Chancellor said, there were no circumstances to restrain, even as to chattels, the generality of the expression, dying without issue, from meaning an indefinite failure of issue, to issue living at the

IN ERROR. death of the first taker ; and, therefore, the limitation over of
....... the chattels was too remote, and they vested absolutely in
ALBANY, January, 1819. the first taker.

ANDERSON v. JACKSON.

I have now finished a review of the material decisions in
England and the United States, on the great question before
us ; and it appears to my humble judgment that no point of
law was ever more completely established, and better fortifi-
ed by all that is venerable in authority on each side of the
Atlantic.

The contrary doctrine was mistakingly, and upon a very
imperfect examination of the subject, declared by the Su-
preme Court in Fosdick v. Cornell. The present case, and,
perhaps, one or two more, have been decided entirely
upon the strength of that decision, and a majority of the
present judges of the Supreme Court have, probably, never
examined the question beyond looking into the case of Fos-
dick v. Cornell, for they were not upon the bench when
that decision was made. This is the first time that the
question has ever come before this court, and I see no rea-
son why we may not, and, indeed, why we ought not to ex-
amine it freely upon its intrinsic merits.

I am, accordingly, of opinion, that the judgment ought to
be reversed.

ALLEN, BATES, CHILDS, HASCALL, LOUNSBERRY, SEY-
MOUR, SKINNER, and WILSON, Senators, concurred.

HAMMOND, Senator. The question arising in this case is
of great importance, not only as it regards the value of the
property in controversy between the parties, but, also, as it
respects the principle of law involved in its decision.

Did Joseph Eden, under this will, take, in the premises
devised to him, a conditional fee, or a fee simple absolute ?

By the act of the legislature of this state, entitled " An Act
to abolish entails," &c. passed February 23, 1786, it is evident
that the legislature contemplated cases in which persons, by
conveyances and wills might thereafter intend to create such
estates as if that act had not been passed, would have been
estates tail; and they enact, that whenever such an estate
should be intended to be created, it should be deemed and
adjudged to be an estate in fee simple absolute. It is not

necessary here to inquire into the policy of this statute. It is a law passed by a competent authority, and, in its very terms, is mandatory on the judicial tribunals of this state. If any person would, if that act and the act thereby repealed had not been passed, have become seised in fee tail, such person shall be deemed and adjudged seised thereof in fee simple absolute. Nothing, therefore, can be plainer than that the intention of the legislature was, that whenever the case should occur, no discretion should be left with the judicial tribunals. The inquiry, then, is narrowed down to this : If the acts of 1782, and of 1786, had not been passed, would *Joseph Eden*, under the will of his father, have been seised of a conditional fee, or fee tail, in the premises?

I know no other way of resolving this question than by examining to the *English* statute, by which entails were created, and the decisions of the *English* courts under that statute ; for I understand it to be settled, that the construction given, by the superior courts in *Great Britain*, to statutes, conveyances, and devises, and to particular words in conveyances and devises, prior to the year 1775, is evidence of a part of the common law of *England;* and by the solemn act of the framers of our constitution, that common law, subject to the exceptions contained in the constitution, is a part, and an important part, of the law of this state.

Conditional fees existed at common law, before the passage of the statute *De donis.* But as it was the settled doctrine that a person holding an estate to him, and the heirs of his body, which constituted a conditional fee, who had had issue, the condition being performed, he then had an estate in fee simple absolute, so far as to enable him to aliene the land in prejudice to his issue, and to the reversionary interest of the donor, and also, to subject him to forfeit such estate by treason ; the statute *De donis* was passed to remedy these evils. This appears evident from the recitals in the act itself; for, among other things, it recites, " In case also, where one giveth lands to another, and the heirs of his body issuing, it seemed very hard, and yet seemeth to the givers and their heirs, that their will being expressed in the gift, was not heretofore, nor yet is observed. In all the cases aforesaid, and after issue begotten and born,

between them, (to whom the lands were given under such condition,) heretofore such feofees had power, to aliene the land so given, and to disinherit the issue of their land, contrary to the minds of the givers, and contrary to the form expressed in the gift. And further, when the issue of such feofee is failing, the land so given ought to return to the giver, or his heirs, by form of the gift expressed in the deed, though the issue (if any were) had died; yet, by the deed of feoffment of them (to whom land was so given upon condition,) the donors have heretofore been barred of their reversion, which was directly repugnant to the form 'of the gift. *Wherefore*," &c. it then proceeds, " in order to provide a remedy in the aforesaid cases," to enact that thereafter the will of the giver should be observed, so that they to whom the land was given should not have power to alien the land so given, but that it should remain to the issue, and on failure of issue that it should revert to the donor. (2 *Inst.* 231.)

Is the gift, from *Medcef Eden* the elder, to *Joseph Eden,* within the cases provided for in this statute? It is, in my view, hardly possible to take it out of its operation, even if we were to close our eyes on all the decisions which have been made in similar cases since the passing of the act in 1285. The gift or devise, taking the two clauses in the will, which relate to this property, together, is to *Joseph' Eden* and his issue; and on failure of issue by *Joseph Eden,* then to *Medcef Eden,* if he survived *Joseph;* and if both died without issue, then to the testator's brother and sister in *Yorkshire,* and their heirs. Is not this the giving of an estate to another, and the heirs of his body issuing? Most indubitably it is; and if so, then this is one of the very cases in which the statute *De donis* declares, " that the will of the donor *shall* be observed." If so, *Joseph Eden* would, if our acts of 1782 and 1786 had not been passed, have been seised of an estate in fee tail in the premises.

If I have not been quite mistaken in my examination of cases which have been decided in the *British* courts, in which questions similar to the one now under consideration have been agitated, those cases afford pretty conclusive proof that the present case would have been within the statute *De donis.*

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

It may be proper here to remark, that for several centuries past the *British* courts, under the impression that the great number and magnitude of estates in that kingdom, held in fee tail, were injurious to the prosperity of that nation, particularly in reference to its commerce, have manifested a strong inclination to give such a construction to legal instruments, as to create as few of those estates as possible, without doing violence to the statute. Keeping, then, in view, this acknowledged inclination of the *English* courts, if it shall appear, on a review of their decisions, that, notwithstanding their unwillingness to increase the number of entailed estates in the kingdom, the estate of *Joseph Eden* would have been there considered an estate in fee tail, in my opinion, there cannot be a doubt what ought to be the decision here.

I have said that the *British* courts, in their construction of legal instruments, leaned against the creation of estates tail. Accordingly, after the subjects of that government were authorized to dispose of their lands by will, executory devises were much favoured. So far did they go in support of executory devises, as, at first view, would seem to disturb some of the important common law rules, which had been before established as to the disposition of real property. Thus an executory devise needed not any particular estate to support it; and by it a fee simple, or other less estate, might be limited to take effect after a fee simple. (2 *Bl. Com.* 172.) But in both cases, the contingency ought to be such as may happen within a reasonable time, as within one or more lives in being, or within a moderate term of years. Thus, where an estate was given to a man and his issue, provided he had issue during the life of *B.*, and on failure, then to *C.*, the devise over to *C.* was held a good executory devise, because the contingency in the case supposed must happen during the life of a person in being at the time of the grant. But if the estate was granted to *A.* and the issue of his body, and *on failure of issue*, then to *B.*; here the period when the issue of *A.* should fail being wholly undefined, it might, in notion of law, be extended to centuries then to come; and it was held that the devise over could not be supported. In this

IN ERROR.

.......

ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

last case the first taker became seised of an estate in fee tail.   In the case now under consideration, the devise over is on failure of issue generally; and if the rule I have just stated be correct, I think there is no room to doubt that, laying out of view our statutes relating to entail, *Joseph Eden* would have taken an estate in fee tail.

A current of cases, decided in *England* since the year 1285, will, I think, pretty conclusively prove the rule I have laid down to be correct.

The cases cited on the argument, from the *Book of Assizes,* some of which were decided at a very early period, prove that this was the construction given to the statute shortly after its passage ; and, according to my reading, the more modern decisions in *England* have uniformly accorded with the early adjudications.

In *Morgan* v. *Griffiths,* (*Cowp.* 234.) *A.* devised his land to *B.,* his son, and " to his *heirs and assigns* forever ;" and for want of heirs of *B.* then to *C.* and his heirs.   *B.* entered and had issue, *D.,* who, it was held, took an estate tail.

In *Denn* v. *Shenton,* (*Cowp.* 410.) *A.* devised land to his son *B.* and the heirs of his body, and their heirs for ever *;* but in case *B.* should die without *leaving* issue, then to *C.* and his heirs.   *B.* had issue, a son, *D.* and died.   *D.* entered, devised the estate to his mother, and died.   The heir of *C.* commenced an ejectment suit against *D.*'s devisee, and claimed to recover, on the ground that *D.* had an estate in fee tail, which, by the failure of issue, was determined.   The court held the case too clear to admit of a doubt that *D.* had an estate tail which terminated with his life, and that the plaintiff was entitled to recover.   In *Blaxton* v. *Stone,* (3 *Mod.* 123.) and in *Denn,* ex dem. *Slater,* v. *Slater,* (5 *Term Rep.* 335.) the same doctrine is explicitly recognised. But the case of *Tenny,* lessee of *Agar* v. *Agar,* (12 *East,* 253.) in all important points, is precisely similar to the case now under consideration.   In that case, the testator gave lands to *B.* his son, and *his heirs forever,* upon condition that he paid his daughter *C.,* a sum of money, the payment of which was charged on the land devised ; but in case both son and daughter should die, without *leaving* any child or issue, then the reversion to *D.* and his heirs.   *B.* suffered a common

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

recovery in which he and his sister were the vouchees, and declared the uses thereof to himself in fee ; and, afterwards, by his will, devised the premises to the defendant in fee. The son and daughter both died without issue. On their deaths, the suit was commenced by *D.* It may be observed, that in this case the plaintiff had to encounter two objections which *Anderson*, in the case now under consideration, has not. It was urged, that inasmuch as the payment of the money to the daughter was charged on the premises, and an express power of re-entry given by the will, on failure of payment, that the testator could not have intended, in any other event, to have given her the possession of the premises ; and, therefore, that his intention was to have given his son a fee simple. It was also contended, that the words, *leaving* issue, implied issue living at the time of the death of the first taker ; and that, therefore, an executory devise might be supported. After an elaborate argument, and a review of all the cases, the court decided that the son took an estate tail, remainder to the daughter of the testator in tail.

These cases seem to me to prove, according to the construction of devises, and the statute *de donis*, by the *British* courts of common law, that if the question was to be decided in *Westminster Hall*, not a doubt could reasonably be entertained but that it would be there adjudged, that *Joseph Eden*, under the will of his father, took an estate tail in the premises in question.

But the Supreme Court, in the case of *Fosdick* v. *Cornell*, (1 *Johns. Rep.* 440.) have decided differently ; and to the reasons given for that decision, this court is referred for those which governed the decision in the case now under consideration. The first case cited in support of this opinion is that of *Pell* v. *Brown*, (*Cro. James*, 590.) which is relied upon as a leading case. In that case the devise was to *A.* and his heirs forever ; but if *A.* died without heirs *living B.*, then the devise was over to *B.* This was decided to be a devise, in fee, to *A.* ; the words "*living B.*," being sufficient to make the devise over to *B.* good as an executory devise. But in that case the essential quality to support an executory devise existed ; namely, in definitely limiting the time when the contingency should happen, to wit, during the life of *B.* It

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

was on this ground that the decision was made. It is unneces-sary for me to remark, that in this essential part of that case, it differs totally from the one now to be decided.

The next case is *Hughes* v. *Sayer*, (1 *P. Williams*, 534.) The testator had devised his *personal* estate to *A.* & *B.*, and upon either of them dying without issue, then to the survi-vor. This was held a good devise over. Had the devise been of real property, this case would have been in point. But the doctrine has been long since settled in *England*, that the same words used in a will, when applied to real property, have a different construction, when used in refer-ence to personal property. In the one case, they create an estate in fee tail; in the other, a fee simple, to be made void on the happening of a contingency.

There are some very good reasons for these rules, (6 *Term Rep.* 589—590.) but, according to my view of the subject, it is unnecessary to state them. For, if it can be shown that such is the fact, that the courts in *Great Britain* have, from the earliest times, down to the present moment, considered the rule I have mentioned as obligatory, I am warranted in assuming that such is the common law; and that, consequently, the judicial tribunals of this state are not at liberty to depart from it without legislative provision.

But the case of *Denn* v. *Shenton*, (*Cowp.* 410.) already mentioned, settles the question, beyond the reach of doubt. In that case, the question was, whether the words, dying without *leaving* issue, meant an indefinite failure of issue : And it was admitted, that had this been a bequest of per-sonal property, these words would have supported the devise, even if the first taker had died without issue. Lord *Mans-field*, on the argument, put the question to the counsel for the defendant, whether he knew of any case where, upon a limitation of lands upon a dying without issue, those words had been confined to a dying without issue *living at the time of the death.* His lordship added, " The distinc-tion is between a devise of lands and personal estate." In the latter case, the words are taken in their vulgar sense, that is, a dying without leaving issue, at the time of his death; in the former, they are taken in a legal sense, and, that is, *when* there is a failure of issue. The counsel named

no such case. This was so late as the year 1776. Lord Mansfield, as I have before stated, said he considered the case too clear to admit of a doubt.

The cases of *Target* v. *Gaunt*, (1 *P. Wms.* 432.) *Pinbury* v. *Elkin*, (1 *P. Wms.* 563.) and *Forth* v. *Chapman*, (1 *P. Wms.* 663.) all support the doctrine laid down in *Denn & Shenton.* It is true, that Lord *Kenyon*, in *Porter* v. *Bradley*, doubted whether the words, " leaving no issue," when applied to personal property, should have a different construction, than when applied to real property. But he did not even venture to express an opinion to that effect, and it would be going very far, to permit the doubt of a single judge to be set up against a current of decisions in *England*, which, I conceive, prove the rule to have been there long since immutably settled. Lord *Kenyon* himself, in *Daintry* v. *Daintry*, (6 *Term Rep.* 307—314.) adopted the very distinction, the correctness of which he before seemed to doubt. If I am right in my view of this case, it, of course, can have no bearing on the question now to be decided.

The case of *Roe* v. *Jeffery*, (7 *Term Rep.* 589.) is also cited. In that case, *A.* devised lands to *B.*, and if he should die and *have* no issue, then to *C. D. & E.* It was held, that the devise over was good; *because*, the court were of opinion, that the words *leave no issue*, were synonymous to the words, *no issue living* at the time of the death of the first taker. It is plain, I think, that this case does not touch the one now under consideration. The general rule in this very case is admitted, that if the words used by the testator were not such as would warrant the court in inferring that he meant issue living at the time of the death of the first taker, it was an estate tail. In the present case, it will hardly be contended that such an inference can be fairly drawn from the words of Mr. *Eden's* will. But it is proper to remark, that even this case stands alone ; that in *Denn* v. *Shenton*, above cited, the decision of the court of King's Bench, (Lord *Mansfield* presiding) was directly the reverse, and that in the case of *Agar* v. *Agar*, which was decided so late as the year 1810, this decision is not recognized as law.

The last case from the *English* authorities, cited in sup-

port of the opinion of the Supreme Court, which I shall notice, is *Porter* v. *Bradley*, (3 *Term Rep.* 143.)    This case was cited with considerable confidence by the counsel on the argument, and seems to have had great weight with the court, in *Fosdick* v. *Cornell.*    *A.* devised land to his son *B.* and his heirs and assigns forever; but if he died " *without leaving issue behind him*," then to *C.*, &c.    The court held that *B.* took an estate in fee simple, and that on his dying without issue, the remainder over was good by way of executory devise.    *Because*, the words " *leaving no issue behind him*" were deemed tantamount to the words, leaving no issue at the time of the death of the first taker.    It is hardly necessary again to remark, that this decision does not at all affect a devise, where the limitation over is on failure of issue generally.    Indeed, Lord *Kenyon*, in delivering the opinion of the court, says, that if the subsequent part of the devise had been, and in case he shall die without heirs, (or issue) then over, it would have given *B.* an estate in fee tail.

Thus, it appears from the very case cited, to support the claim of the plaintiff below, that the words in the will now under consideration, would, in *England*, have been adjudged to give *Joseph Eden* an estate in fee tail.    Indeed, I understood one of the counsel for the plaintiff below, to admit on the argument, that if this question was to be decided in *England*, it would probably be there adjudged, that *Joseph Eden* took an estate in fee tail.    For my part, I cannot doubt but that it would be so adjudged.

Although the decisions of the Supreme Court are always entitled to great respect, yet I have not thought it necessary to notice the cases of *Jackson* v. *Blanshan*, (3 *Johns. Rep.* 292.) of *Moffat* v. *Strong*, (10 *Johns. Rep.* 12.) nor of *Jackson* v. *Staats*, (11 *Johns. Rep.* 337.) because the decisions in all these cases, so far as they relate to the question now under consideration, were founded on that of *Fosdick* v. *Cornell*, and if the reasons on which the decision of that cause is founded, are not sound, it is evident that the subsequent decisions must, also, be erroneous.

But it is alledged, that as entails were abolished before the will in question was made, and as every man is presumed to know the law of the land, the testator could not

have intended to create an estate which did not and could
not exist; and that, therefore, he intended to give *Joseph*
*Eden* such an estate in the premises in question, as would
make the devise over good. To aid this allegation, the old
and salutary rule, that the intention of the testator shall
have a controling influence in the construction of wills, has
been referred to.

I agree that this reasoning is entitled to great considera-
tion in the decision of this cause; but I cannot admit the
correctness of the allegation to the extent to which it
has been pressed upon us. If it were true to the extent
contended for, it would have been sufficient for the legisla-
ture, simply to have abolished estates tail, and the latter
clause in the section, which I have quoted, would have been
useless. For if this proposition could have been support-
ed in all its extent, of what use was it for the legis-
lature, after abolishing entails, to enact, that if any
person *thereafter* would, if that act had not been passed,
have become seized in fee tail of an estate, he should be
deemed seized thereof in fee simple. The legislature,
therefore, evidently presupposed cases, in which testators,
from an ignorance of the law, might intend to create estates,
which if that act had not been passed, would have been
estates in fee tail; and they proceed to declare, what shall
be adjudged to be the legal effect of such intent, whenever,
according to the settled rules of construction of devises, it
could be fairly collected from the will. It is said, with
great propriety, by Ch. J. *Parsons*, (5 *Mass. Rep.* 501.) that
"in construing any devise, if it be made by words which
have long received a particular technical construction, and
thus become a rule of property, that construction ought to
be received, as we may unsettle the title to estates long
holden under such a rule;" and so well settled is the con-
struction of the words in this devise, in favour of the notion
of an estate in fee tail, if our statute had not been passed,
that I cannot feel myself at liberty to depart from that con-
struction.

It is also urged, that the genius of our government, and
sound policy, require that the *English* rule of construction,
in relation to the present question, should be abolished.

I confess I very much doubt the correctness of this position. To encourage the creation of estates in fee simple, in persons having a life estate in lands, appears to me much better calculated to promote the prosperity of a people highly commercial in their character, than to afford too great a facility of fettering them by contingent remainders. The inconveniences and dangers resulting from executory devises, are strongly exemplified in the case of *Peter Thelusson's will*. (4 *Vesey*, 227. S. C. 11 *Vesey*, 112. 2 *Bl. Com.* 74.)

But admitting that sound policy required the abolition of the rule of construction, which I contend is established in *England*; yet, if it be true, that from a series of decisions in the *British* courts, from the year 1285 to the year 1777, such a rule has invariably been adhered to, as when applied to the will in question would have given *Joseph Eden* an estate in fee tail; and when it is recollected that the statute is mandatory on the judicial tribunals in this state, to wit, that he *shall* in such case be *deemed* and *adjudged* seized thereof, in fee simple absolute, I cannot but think that the argument founded on policy or expediency, is addressed to a wrong tribunal. The legislative, not the judicial department of government, is alone competent to apply the proper corrective. For another and more important principle in our government may, by such a mode of reasoning, be violated; I mean that of keeping distinct, and within their own constitutional boundaries, the different branches of the government. The business of the judicial tribunals is to declare what the law is, and not what it ought to be. Wherever they shall undertake to alter or disregard any part of the common law of *England*, not inconsistent with our constitution and statutes, because it may appear to them inconvenient, inexpedient, or impolitic, and shall be tolerated in such undertaking, the judge becomes also a legislator, and one of the main pillars of our constitution is broken down : our most sacred and invaluable rights would then depend, not on the laws of the land, but on the will of individuals.

I am of opinion that the judgment below ought to be reversed, and that judgment should be entered on the verdict for the defendant below.

*H.* YATES, Senator. This is the first time, since the case of *Fosdick* v. *Cornell*, that the doctrine there established has been called in question in this court; and when we consider that the principles so decided have been recognised in, at least, three subsequent cases, it would require some very strong, and, indeed, an irresistible course of reasoning to demonstrate that the titles acquired under those decisions ought to be shaken, and property to an immense value again set afloat.

IN ERROR.
.......
ALBANY,
January, 1819.

ANDERSON
v.
JACKSON.

I believe, upon the most mature reflection, that the decision of the Supreme Court can be supported upon the soundest legal principles.

I hold it to be a well-settled rule of construction that the terms used in a will are to be understood in their popular sense, unless opposed to some rigid, unbending rule of law. Now, no one can hesitate, for a moment, as to the meaning of the testator in the case before us. He clearly intended, that if either of his two sons should die without lawful issue, the survivor should take the whole, which was devised to both; and the only question is, whether there is any inflexible rigid rule of law to wrest the plain and manifest intention of the testator to a purpose altogether different from what he intended. I am unacquainted with any such rule ; nor do I consider the cases cited, when collectively taken, to establish such a position. But if there are any such cases, let it be remarked, that the policy and genius of the *British* government are, in some respects, opposed to our own; they encourage and support estates tail, as being important in forming family settlements; they always lean in favour of the eldest son, as heir at law; and to oust the devisee, they invariably incline to maintain some of the features of the feudal system, which are so intimately connected with the splendour of a monarchy, and the wealth and dignity of an overgrown nobility. On the contrary, it is the policy and genius of our republican institutions, to consider all the children of a parent as placed on an equal footing, and to discountenance an aristocracy of wealth and influence.

I shall now proceed to show, from a review of the leading cases, that the law is not opposed to the plain and manifest

IN ERROR.
........
ALBANY,
January, 1819,
ANDERSON
v.
JACKSON.

meaning of the testator. Indeed, it would be serious matter of regret, that any court should be called upon to adjudge an instrument in writing, to operate contrary to the obvious meaning of the party who made it; but I am happy to say, that we are not placed in a situation so repugnant to our feelings, and that the law and justice of the case are united in favor of the construction I have given. The testator says in this will, that " If either of his sons should die without issue, his share shall go to the survivor." *Joseph Eden*, one of the sons, died on the 20th of *August*, 1813, without issue, and *Medcef Eden* survived him; he ought, therefore, to take under this will, according to the testator's intention. In the case of *Fosdick* v. *Cornell*, (1 *Johns. Rep.* 439.) the will was, " that if any of the testator's sons should die without heirs male, the land should go to the survivor." On that occasion, as on this, the question was, whether the will created an estate tail or not; and counsel of the first eminence discussed that question, in which all the leading *English* cases were cited and urged in the argument. The court said, that according to the case in 1 *P. Wms.* 534. (*Hughes* v. *Sayer*,) it was a good devise over; for the words dying without children, must be taken to be children living at the time of the death of the party, and could not mean an indefinite failure of issue. *Thompson*, Ch. J. who delivered the opinion of the court, clearly showed, that it was fairly to be collected from the provisions of the whole will, that the testator intended that the devise over should take effect, if the first taker should die without a son living at the time of his death, and that it was not to depend on an indefinite failure of issue.

The next case, in the order of time, is that of *Jackson* v. *Blanshan*, (3 *Johns. Rep.* 292.) The words in the will were, " That if any of his children should die before they came to full age, or without lawful issue, then his or their part should be divided among the survivors." *Kent*, Ch. J. said, that such a devise over was good by way of executory devise, and not too remote; for the construction, he stated, was well settled, that the words, " without lawful issue," meant issue living at the time of his death; and he quoted the case of *Fosdick* v. *Cornell*, as settling the point; the rest of the court

concurred in that opinion. The next case is that of *Moffat* <span>IN ERROR.</span>
v. *Strong*, (10 *Johns. Rep.* 12.) The words of the will
were, " If any of the sons should die, without lawful issue, <span>ALBANY,<br>January, 1819.</span>
then his part to go to the survivors," &c. *Kent*, Ch. J. said,
that Lord *Thurlow* had mentioned there were fifty-seven cases <span>ANDERSON<br>v.<br>JACKSON.</span>
on the point, and that they had increased greatly since ; and
Ch. J. *Kent*, proceeded to consider the subject fully, and
after admitting there were some contradictory opinions,
came to this conclusion, after great deliberation : " That
the intent of the testator, according to the settled legal
construction of terms, was to provide for the surviving sons,
on the contingency of either of the son's dying, leaving no
issue at his death ; and as this intention is consistent with
the rules of law, the limitation over is good by way of exe-
cutory devise." The rest of the court concurred in the
opinion.

The next case is *Jackson* v. *Staats*, (11 *Johns. Rep.* 337.)
The words in the will were, " if any one or more happens to
die without heirs, then his or their part to be equally divided
among the rest of the children," &c. The question was
again fully and ably discussed. *Spencer*, J., in delivering
the opinion of the court, said, " The plain and natural in-
tention of the testator was, that such parts of his estate as he
had specifically devised, both real and personal, should go
over to his surviving children, on the contingency stated in
the will ;" and he cited the case of *Moffat* v. *Strong*, and then
entered fully into the reasoning of the leading cases, and,
with the court, came to the same conclusion as stated in the
cases I have already cited.

I am unwilling, for one, to interfere too much in disturb-
ing titles to real property, which may have been acquired
under the repeated and solemn decisions of the Supreme
Court ; more especially, when such efforts are made to
counteract the plain justice of the case, and the manifest
and decided meaning of the parties.

I am, therefore, of opinion, that the judgment below ought
to be affirmed.

ADAMS, AUSTIN, BARNUM, BARSTON, BOWNE, DAYTON,

ALBANY,   DITMIS, KNOX, MALLERY, NOYES, ROSECRANTZ, ROSS, and
August, 1819.  SWART, Senators, concurred.

HALSTED
v.
SCHMELZEL.        A majority of the court (a) being of the same opinion,
                 it was thereupon ORDERED and ADJUDGED, that the judg-
January 18th,    ment of the Supreme Court be affirmed ; and that the plain-
                 tiff in error pay to the defendant in error, one hundred and
                 fifty-eight dollars and thirty-four cents, for his costs and
                 charges, in and about his defence in this court ; and that the
                 record be remitted, &c.

                                              Judgment of affirmance.

                    (a) For Reversing, 10 : for Affirming, 14.