CHANCERY.

Case 131.

May 27.

Allegations of bill and answer.

# Hart *vs* Thompson's Adm'r. and Heirs.

### APPEAL FROM THE MADISON CIRCUIT.

*Wills.   Executory devises:   Trustees and trusts.*

CHIEF JUSTICE EWING delivered the opinion of the Court.—JUDGE BRECK did not sit in this case.

THIS case grows out of and is based upon the decision of this Court, affirming the decision of the Circuit Court, in the case of *Keziah Thompson* vs *Peebles' heirs et al.* in which said Hart had filed a cross bill. That decision will be found reported in 6 *Dana*, 387, in which a history of many of the facts involved in this case will be seen.

After the termination of that case, Nathaniel Hart filed his bill against the heirs and administrator of Lawrence Thompson and of Keziah Thompson, both of whom had died, the former some two years before the latter, asking first a rescission of the contract by which the 400 acres of land claimed by Peebles' heirs, was conveyed to him, and a restitution of his consideration, with interest and costs. Secondly, if he was not entitled to that, damages for a breach of the warranty, and payment of the same to him out of the proceeds of the slaves and their descendants, which had been conveyed by him in trust for the benefit of his sister, Keziah Thompson, exclusive of her husband, and the trustee, being her son, had died some ten years before his mother; also out of the proceeds of two hundred acres of land, which he charges belonged to L. and K. Thompson, and which they died possessed of, and some small amount of personal estate; all of which slaves, land and personalty, had been sold, and the proceeds in part paid over to the heirs, and the residue was in the hands of the purchaser's administrator and commissioner, who sold the slaves for the purpose of a division, and which he injoins, charging that some of the heirs were insolvent, and some had left the State, &c. The heirs answer, controverting in every respect, his

right to recover, and claiming the entire estate, as heirs of their mother, Keziah Thompson, and not as heirs of their father, L. Thompson, who they charge died insolvent.

The Circuit Court, upon the hearing, dismissed the complainant's bill, and he has appealed to this Court.

For the reasons given by the Court below, the most of which we approve, and for many others which might be given, we think that the bill was properly dismissed.

In the event of a rescission of the contract only, can Mrs. Thompson's estate be rendered liable to refund? The deeds not having been acknowledged so as to pass her title, or be binding upon her, cannot be construed so as to impose a covenant of warranty upon her, if even such covenant might be obligatory, had the deed been properly acknowledged. And we think no good ground for a rescission has been made out. There is no misrepresentation or concealment pretended. The complainant was well apprized of the true state and condition of the title of the land which he contracted for.

The relation which he occupied, as the surviving executor, and "overseer" of the estate of his deceased father, with power to "sell so much of the personalty or realty, as shall be sufficient to pay off all just debts, as well as all the expenses that shall be necessary towards *securing* the several tracts of land claimed by the testator, either by settlement, pre-emption, entry, *purchase* or otherwise, &c." and also with power to allot to each of the testator's children, as they came of age or married, certain articles of personal property, as well as "a good tract of land not to exceed one thousand acres," made it his especial duty to look into and understand the true condition of the land claims, whether acquired by *purchase* or otherwise, and to take the necessary steps for the settlement and security of the titles. His attitude and his duties required that he should have been much better acquainted with the true state and condition of the land purchased, as well as of the title to it, than his sister, and we must presume that he was much better acquainted with both. He also had the deeds in his possession, and was well acquainted with all the facts in relation to

the time, manner and form of the acknowledgments, and of the recording of the deeds. Again, it was more especially the duty of the complainant, as the executor of the estate, with the power to allot to each of the children a good tract of land, to see that equal justice was done to all; yet in the allotment of 1809, the tract which had been previously sold to Peebles by the reckless husband of his sister, was allotted to her, and the whole burthen of the controversy with Peebles' heirs thrown upon her, which devolved upon and should have been equally borne by all the devisees, and have been more especially attended to and cleared of the incumbrance, by the complainant, who was the executor and "overseer" of the estate, with the powers before alluded to. Again, with a full knowledge of all the facts, and a perfect acquaintance with the necessitous condition of his sister, a few years after the allotment, he purchased from her the same tract which had been thrown upon her in the division, at less than one third of the amount at which it had been set apart to her, and at about one fifteenth or twentieth part of its subsequently increased value, free from the incumbrance. Though the acknowledgments and recording of the deeds were irregular, he seems never, in his sister's lifetime, to have made any effort to have them corrected, nor can we presume that she would have refused to do so, had application been made to her; and indeed we have evidence to believe, that she would not have refused, from the fact that she signed and acknowledged two deeds to the complainant. Besides, he relied upon and availed himself of the deeds in the prosecution of the suit against Peebles' heirs, and seems not to have been obstructed in the lower Court, by reason of any defect in the authentication of the deeds, but his suit was dismissed there, *without prejudice,* upon other grounds, which upon the exercise of proper diligence upon his part, in bringing the proper parties before the Court, and preparing the case, might have been obviated, and perhaps the ultimate right, after the death of Lawrence Thompson, might have been secured. Though this Court, in the opinion delivered, gave various reasons for the affirmance, they could not do more than affirm the decree as made.

Again, had the complainant, as the executor and "over-seer" of the estate, as it was his duty to do, instituted the suit in proper time, and in the names of the proper parties, instead of delaying, and afterwards, by the allot-ment, throwing the whole burthen of the controversy upon his sister, in all reasonable likelihood the land might have been recovered. Be this as it may, in view of all the foregoing considerations, and after the complainant has lost the suit, and that too perhaps by his own negligence, and has failed to reap the benefit of his enormous specu-lation, we cannot indulge him, after a lapse of more than twenty years, to come into a Court of equity and ask a rescission of the contract, and a restitution of the little pittance which he secured to her, it being almost the only remnant which she has been able to realize as her share of the large patrimony left her by her deceased parent, if the 200 acres upon which she died be taken from her or her heirs, as the property of her husband, which the com-plainant seeks to do by his bill in this case.

If it were conceded that a proceeding in Chancery might be tolerated for a breach of the warranty of Law-rence Thompson, which, from the foregoing suggestions is certainly to be greatly questioned, such proceedings could only be made to reach his estate, descended to or distributed among *his* heirs, and not the estate which they derived from their mother. He and his wife died possessed of the aforesaid two hundred acres of land, which originally belonged to her father, and the title to which was perfected by grant to her and his other chil-dren and heirs, more than forty-five years ago. Lawrence Thompson and wife settled on the tract upwards of forty years ago, and it was generally reputed and believed to belong to Mrs. Thompson, and her husband was reputed to be insolvent and to own nothing out of which a debt could be made, for many years before his death. From these facts the possession would be regarded as held under her title, and would enure to its support and effec-tuation, and ripen and mature it into a valid title in her, unless it can be shown that her husband held a valid title to the same. This has been attempted by the exhibition of the will of Simpson Hart, who was one of the devi-

*The heirs of the wife are not lia-ble out of estate descended thro' the mother, to make good the warranty of the father.*

sees of her father, Nathaniel Hart, Sr. deceased, who died in 1788, a few years after the death of his father, a single man and without issue. By his will he made the following devise: "Whereas I have sold unto my brother-in-law, Lawrence Thompson, my right to one thousand acres of land lying in the district of Kentucky, which my father left me in his last will and testament, which said land was to be of my own choosing—my will and desire is, that agreeably to my contract with said Thompson, he shall have, of his own choosing, said one thousand acres of land." By the division of 1809, before referred to, there was allotted to the "*heirs* and devisees" of Simpson Hart, deceased, seven hundred acres in Madison, Boonsborough, with this reservation in the agreement of division, signed by the devisees: "It is understood that Nathaniel Hart reserves all claim which he may have *under his father's will,* in the part allotted to Simpson Hart's heirs and devisees;" and *it is* proven by John Hart, that the complainant, Nathaniel Hart, always refused to recognize the will of Simpson Hart. Yet it is contended by his counsel, that Lawrence Thompson held the title to the two hundred acres of land in question, under the will of Simpson Hart, deceased, and seeks to subject it as his land thus devised.

The will of Nathaniel Hart, Sr. deceased, under which Simpson Hart claims, contains this clause: "My will and desire is, that all my estate, both real and personal, be equally divided amongst my said nine children, then living, or their lawful heirs if dead, and if either of my nine children should *die without heirs of their body, lawfully begotten,* that *their part,* so *allotted and given them* as aforesaid, be *equally divided amongst my other children* THEN LIVING."

It is contended under this clause of the will, that the devise to Simpson Hart, as well as the other devises, was the devise of a fee tail estate, which by our statute, (1 *Stat. Law,* 442,) is converted into a fee simple estate, and the conditions annexed thereto, restraining alienation, are abrogated, and Simpson Hart became invested with a pure and absolute fee, with the power of unlimited dis-

position of the estate as such. We cannot sanction this position.

We are aware that the English Courts have gone great lengths in construing the language of a devise into the creation of an estate tail. Their policy and the genius of their government impells them to this construction, as the means of securing landed estate to the eldest son and his issue, sustaining family settlements and proping up their nobility. The policy and genius of our government dictates a different construction, or they allow that construction which approaches nearest to the intention of the testator, which should be the governing consideration in the interpretation of all wills, as well of the realty as of the personalty. But according to the strictest rule of English interpretation, we cannot regard the devise in question as a limitation over, after an indefinite failure of issue, which would constitute it an. estate tail, but as a limitation over upon a fee, which vests the estate in the surviving children, upon the death of either without *issue living* at his or her death, and is good as an executory devise.

A devise to all the testator's children to be equally divided, "but should either die without heirs of their body lawfully begotten, that their part so allotted and given to them as aforesaid, to be equally divided amongst my other children then living," is good as an executory devise, & upon the death of either child without issue, vests in the surviving children.

The words "to be divided among my other children *then living*," shows that the testator looked to a definite period when the contingency, "the death without lawful heirs," was to happen, namely, whilst his other children were *then living*, and not to an indefinite failure of heirs of his body, and brings the case within the distinction taken in the case of *Pells* vs *Brown*, (*Cro. Jac.* 590;) *Porter* vs *Bradley*, (3 *Term Rep.* 143;) *Roe* vs *Jeffrey*, (7 *Term Rep.* 588;) *Fosdick* vs *Cornell*, (1 *John. Rep.* 439;) *Anderson* vs *Jackson*, (16 *John. Rep.* 382;) (1 *P. Williams*, 534;) *Jackson* vs *Blanshan*, (3 *John. Rep.* 289;) *Moffett* vs *Strong*, (10 *John. Rep.* 12;) *Jackson* vs *Staats*, (11 *John. Rep.* 337.) Although the authority of the foregoing cases is questioned by Chancellor Kent, in a very learned opinion, delivered in the latter case, in which he and others of the Court dissent from the majority, we think that the principle of those cases at least is consistent with the policy and genius of our government, and whenever, as in the case before us, there is a clear indication of an intention on the part of the devisor to

HART
vs
THOMPSON'S AD.
AND HEIRS.

pass a defeasible fee only to the first devisee, with a limitation over to others, *then living*, at the death of the first devisee without issue or heirs of his body, so as to preserve the estate to his children, that such construction should be given to the devise as to carry out the object and intention of the devisor, and effectuate the purpose of the devise. This alone can be done by giving force and effect to it as an executory devise, limited upon a fee, which is to terminate at the death of the first devisee, without issue living at the time of his *death*. And the more especially should this interpretation be given, since the enactment of our statute abolishing entails, and the conditions annexed to the fee; as by a different construction the most beneficent intention of the devisor might be wholly frustrated and defeated. While the English Courts in a doubtful case, consistently with the policy of their government, might feel authorized to construe the devise into an entail, we, in a doubtful case, would feel authorized to give such construction to the devise as would carry out the intention of the devisor, and give effect to the devise according to such intention.

We think, therefore, that the estate of Simpson Hart terminated at his death, without issue living, and that no estate passed to Lawrence Thompson by the devise to him. Consequently, that he had no title to the land in question, other than as tenant by the courtesy, and his heirs derived no title from him, which can be subjected to the payment of the complainant's demand.

Nor can the complainant subject the slaves, claimed by the heirs, to the payment of his demand. The heirs derived their title to them also, from their mother, and not from their father, and if they could be subjected to the payment of any debt owing by their father, they most unquestionably cannot be subjected to the complainant's demand against them. All the slaves were those and their descendants that were conveyed by the complainant himself to a son of Mrs. Thompson, in trust for her sole and separate use during her life, and at her death, to go and descend to such person or persons as she might direct. Her husband never had any interest in them; and the complainant cannot be allowed, against the express terms

Slaves purchased with the land devised to the wife and conveyed in trust to her and to her appointee at her death, pass to her heirs not the heirs of her husband, nor are they liable for his debts—and if the trustee die the Chancellor will treat the husband as trustee for the benefit of the wife.

of his own deed, to set up claim to them as the property of Lawrence Thompson, or to subject them to the payment of a demand against him.   The death of the trustee can make no difference.   The estate in the slaves will not be allowed by the Chancellor to devolve upon the wife, so as to make them the property of the husband. The Chancellor might and would, upon application, have appointed a trustee to sustain and carry out the objects of the trust, and none having been appointed, would treat the husband as trustee, holding the estate for the exclu-, sive use and benefit of his wife, and would not have permitted him to apply it to his own use, or the payment of his own debts;   much less will the Chancellor permit the complainant, against the provisions of his own deed, to apply it to the satisfaction of his demand against the husband.   It matters not as to the complainant's demand, whether the deed was recorded or not.   He was well apprised of its existence, its character, and object, and will not be allowed, as complainant, to defeat its operation and purpose.

Nor do we think that the complainant has made out a case which entitles him to the aid of the Chancellor in reaching the small pittance of personal estate.   Richardson administered on the estates of both Lawrence and Keziah Thompson, after the death of the latter, and made sale of the whole of the personalty found in the possession of Keziah Thompson at her death, without distinguishing whether any, or what part belonged to Lawrence Thompson at his death.   And whether any or what part did belong to him does not appear.   He is, as has been before said, reputed to have died insolvent, and as owning no property for many years before his death, which was tangible to an execution.   And whether the Chancellor, under such circumstances, should subject the whole or any part of the proceeds of the personalty to the payment of his debts, is questionable.   But conceding that he might, as the complainant's demand sounds in damages, which belongs more appropriately to a common law tribunal to liquidate, and his remedy, if he is entitled to any, in any tribunal, is full and complete at law, and especially in a case where so many equitable objections,

as already shown, exist against the complainant's right conscientiously to enforce his demand, we think that a Court of Equity ought not to afford him relief against the personalty.

The decree of the Circuit Court is therefore affirmed, with costs.